[Crim. No. 2793. In Bank.—October 29, 1925.]

# THE PEOPLE, Respondent, v. SAMUEL GILBERG, Appellant.

[1] CRIMINAL LAW—INSANITY—"SHELL-SHOCK."—"Shell-shock" is not a distinct type of nervous disorder, but a condition produced upon certain organisms by sudden fear or by highly exciting causes. It is not settled, general insanity, but a form of neurosis, a functional nervous disease, not due to organic changes.

[2] ID.—EXISTENCE OF DOUBT—SUBMISSION OF QUESTION TO JURY—EVIDENCE.—The existence of a doubt as to the sanity of the defendant in a criminal prosecution means any doubt that may be created in the mind of the trial court arising from a consideration of all the facts and circumstances which the situation may disclose, and the trial judge may, upon his own motion, in the exercise of a sound discretion, submit the question of the defendant's sanity to the determination of a jury; but such a doubt must be supported by facts and circumstances of a substantial character, and not merely the defendant's assertion of insanity; in other words, to justify the dismissal of the jury or the suspension of a trial under section 1368 of the Penal Code, there must exist reason to believe that the claim of insanity made on behalf of the accused is genuine and not simulated as a means of defeating or delaying the law's penalties in cases where all other means of evading punishment would seem hopeless.

[3] ID.—INSANITY AS DEFENSE—PREPONDERANCE OF EVIDENCE—KNOWLEDGE OF CRIME—EVIDENCE.—For insanity to be available as a defense to crime it must be shown by a preponderance of the evidence that the accused did not know the nature or the quality of the act which he committed, or if he did know the nature and quality of the act, that he did not know it was wrong to commit it; and in this prosecution under an information charging the defendant with the crime of committing a lewd and lascivious act upon the body of a female child of the age of eleven years, in violation of section 288 of the Penal Code, the conduct of the defendant, instantly following the commission of the crime and at all times thereafter, conclusively showed that he was conscious of doing wrong and that he appreciated the nature and the quality of the act at the time he committed it.

2. See 8 Cal. Jur. 278; 14 R. C. L. 607.
3. See 7 Cal. Jur. 862.

[4] ID.—MORAL INSANITY.—In our courts of law, there is no such doctrine established or recognized as moral insanity distinguished from mental derangement, as an excuse for crime, and as an exemption from punishment therefor.

[5] ID.—ASSERTION OF INSANITY—BURDEN OF PROOF.—The burden of proof is always upon the defendant, or upon the person who asserts the insanity of another, to establish its existence by a preponderance of the evidence, and this universal rule is applicable to the issue of mental unsoundness or irresponsibility in every case in which it may possibly arise.

[6] ID.—RAPE — SANITY OF DEFENDANT — EVIDENCE — DISCRETION.—In this prosecution for the crime denounced by section 288 of the Penal Code, in which defendant's counsel did not at any time make a request or motion that the jury be discharged or that the trial be suspended and the question of sanity be submitted to a jury as provided by section 1368 of the Penal Code, the evidence having been ample to support the conclusion of the trial court to the effect that defendant was at all times sane, it did not abuse its discretion by refusing to submit that specially to a jury when counsel for the defendant, during the course of the presentation of the defense and while defendant was on the witness-stand, requested that a recess be taken and the trial continued to give counsel an opportunity to show that defendant was in "no mental shape to go ahead with the trial."

[7] ID.—EXISTENCE OF DOUBT—DISCRETION OF TRIAL COURT—APPEAL.— The question of whether a doubt sufficient to require the trial court to submit the issue of the sanity of a defendant to a jury during trial exists is one that must always rest largely within the discretion of the trial court, and its ruling will not be disturbed on appeal except where the evidence is so lacking as to leave no just room for question that the discretion has been improperly exercised.

[8] ID.—CONVICTION—SUBSEQUENT COMMITMENT TO STATE HOSPITAL— INSANITY—PRESUMPTION.—A judgment, entered after conviction but before sentence, committing a defendant to a state hospital for the care and treatment of the insane is not final and conclusive upon the question of his criminal responsibility, or his ability to conduct his defense in a rational manner; and where the insanity of said defendant is not permanent or habitual, no pre-

4. See 7 Cal. Jur. 865.

5. Burden of proof as to insanity, notes, 36 L. R. A. 722, 727; 44 L. R. A. (N. S.) 119; 34 L. R. A. (N. S.) 1115. See, also, 8 Cal. Jur. 30; 14 R. C. L. 624.

7. See 8 Cal. Jur. 195.

sumption can be indulged that such insanity had an existence at the time of the commission of the crime or of his trial and conviction.

(1) 35 Cyc., p. 1454, n. 16 New.   (2) 16 C. J., p. 790, n. 41. (3) 16 C. J., p. 99, n. 3, p. 100, n. 12, p. 775, n. 76.   (4) 16 C. J., p. 104, n. 31.   (5) 16 C. J., p. 531, n. 81, p. 775, n. 68.   (6) 16 C. J., p. 790, n. 41, 46.   (7) 16 C. J., p. 790, n. 41, 46.   (8) 16 C. J., p. 775, n. 73, p. 1284, n. 66.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. Fred V. Wood, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. Guy Ryker for Appellant.

U. S. Webb, Attorney-General, Wm. F. Cleary, Deputy Attorney-General, Earl Warren, District Attorney, and Chas. Wade Snook and J. F. Coakley, Deputy District Attorneys for Respondent.

SEAWELL, J.—The defendant was charged by an information filed in the superior court of Alameda County, by the district attorney of said county, with the crime of committing a lewd and lascivious act upon the body of a female child of the age of eleven years, who is specifically described in said information, in violation of section 288 of the Penal Code, defining crimes against children. Upon a second trial he was convicted of the offense charged in the information. An appeal was taken from the judgment of conviction and the order denying a new trial to the district court of appeal, first district, division one, and the judgment and order were reversed by that court on the ground that the trial court had abused the discretion vested in it by omitting to suspend the trial and submit the issue of the defendant's sanity to a jury upon the claim made by defendant's counsel that a doubt had arisen as to the sanity of the defendant. A petition having been filed by the attorney-general for a hearing by this court, an order was made transferring said cause to this court for hearing and determination. The only questions presented or argued upon the appeal go to the mental condition of the defendant both at the time he committed

said offense and at the time of the trial of said cause. The
section of the Penal Code under which defendant claims
that it became the imperative duty of the trial court to
have halted the trial and submitted the issue of sanity to
a jury provides as follows:

"If at any time during the pendency of an action up to
and including the time when defendant is brought up for
judgment on conviction a doubt arises as to the sanity of the
defendant, the court must order the question as to his sanity
submitted to a jury; and the trial or the pronouncing of
the judgment must be suspended until the question is de-
termined by their verdict, and the trial jury may be dis-
charged or retained, according to the discretion of the court,
during the pendency of the issue of insanity." (Pen. Code,
sec. 1368.)

The judge who presided at the second trial also presided
at the preceding trial, which resulted in a disagreement of
the jury as to defendant's guilt, and he was, therefore,
given ample time and opportunity to observe the conduct and
appearance of the defendant through two trials and upon
other occasions when the accused was before him on matters
preliminary and incidental to the crime charged. Besides,
the record indicates that the defendant became a witness in
his own behalf at the first trial and related his life history
and furnished all information that was deemed by counsel
necessary to form a basis for the claim that the accused
was insane at the time he committed the crime. It does not
appear that any suggestion was made during the first trial
that the defendant was then incapacitated from making his
defense. His mental state at the time of the second trial
depended upon his mental condition existing at that par-
ticular time. The court had been made acquainted with the
appearance and the history of his prior mental condition
from a number of sources. The conduct and manner of the
defendant when upon the witness-stand, and which gave oc-
casion for the request that a recess be taken and the trial
continued to give counsel an opportunity to show that the
defendant, as put by him, was in "no mental shape to go
ahead with the trial," was before the court for scrutiny.

The defendant had served first in the Canadian and lat-
terly in the American army in the World War. He re-
ceived no battlefield wounds, but claims to have suffered an

injury by falling into a "funk-hole." It appears that he spent considerable time during his enlistment, both overseas and in this country, as a patient in hospitals, under treatment for "shell-shock." **[1]** "Shell-shock" is not a distinct type of nervous disorder, but a condition produced upon certain organisms by sudden fear or by highly exciting causes. It is a form of neurosis. It is not settled, general insanity, but, according to the testimony of the expert offered by the defense, a functional nervous disease, and not due to organic changes.

The defendant was partially examined as a witness on Friday, April 11, 1924, and withdrawn to make way for expert evidence as to his present mental condition. The request for a recess of court was made on the following Monday. When the defendant was first upon the stand his answers to questions were responsive and coherent and his memory fairly good. It was after experts had been called on his behalf, who related in his presence with minute detail the symptoms of "shell-shock" and epilepsy and the effect of each upon the nervous organism as manifested by the external actions of those thus affected, that the defendant, upon resuming the witness-stand, seemed to pass from a rational state into a state of faulty memory and finally into a state of apparent unconsciousness and collapse which caused a temporary cessation of the trial.

**[2]** The existence of a doubt as to the sanity of the defendant means, of course, any doubt that may be created in the mind of the trial court arising from a consideration of all the facts and circumstances which the situation may disclose, and he may, upon his own motion, in the exercise of a sound discretion, submit the question of the defendant's sanity to the determination of a jury. Such a doubt must be supported by facts and circumstances of a substantial character. This right does not arise merely because the defendant asserts insanity, however baseless the claim may be. To justify the dismissal of the jury or the suspension of a trial the court must entertain a doubt founded upon substantial grounds. In other words, there must exist reason to believe that the claim of insanity made on behalf of the accused is genuine and not simulated as a means of defeating or delaying the law's penalties in cases where all other means of evading punishment would seem hopeless. *People*

v. *Fountain,* 170 Cal. 460 [150 Pac. 341], is in point. There a motion was made for a continuance coupled with a request to call a jury to try the sanity of the defendant which was noticed to be heard on the day set for trial. The motion and request were also based on an affidavit of one of the counsel for the defendant that he had conversed with the defendant for an hour on each of two occasions and he believed him to be insane, and that counsel was informed that the defendant was then an escape from an asylum in the state of Iowa. The motion was denied. This court in considering the meaning of section 1368 of the Penal Code, and its application to the question of the existence of "a doubt" touching the insanity of the accused, said:

"The doubt referred to in section 1368 of the Penal Code, upon the existence of which a trial of the present sanity of a defendant must be had is a doubt arising in the mind of the court having the defendant in charge. (*People* v. *Hettick,* 126 Cal. 425 [58 Pac. 918].) Counsel for appellant assume that a doubt of the sanity of defendant must legally have been engendered in the mind of the court on the affidavit of counsel expressing his belief that defendant was then insane, coupled with the further averment of the escape of defendant from an asylum in Iowa to which he had been committed some twenty-eight years before. But the court was not constrained to entertain this doubt simply because counsel entertained such a belief proceeding from some conversations with defendant or the suggestion of a previous commitment and escape. All that was presented on the hearing of the motion was this affidavit of counsel. There was no evidence, oral or documentary, introduced on the subject. But opposed to these matters stated in the affidavit of counsel for defendant, as is said in *People* v. *Kirby,* 15 Cal. App. 264–269 [114 Pac. 794, 796] : 'It is fair to assume that the trial court had ample opportunity to, and did, as was its duty, observe and note the defendant's mental condition from time to time, and in particular on the date when his present insanity was suggested. The knowledge thus acquired may have contributed largely toward rebutting any possible inference of present legal insanity which might have been deduced from the facts stated in the affidavit. Section 1368 of the Penal Code contemplates that the doubt referred to therein must arise in the mind of the court hav-

ing a defendant in charge (*People* v. *Hettick,* 126 Cal. 425 [58 Pac. 918]; *Webber* v. *Commonwealth,* 119 Pa. 223 [4 Am. St. Rep. 634, 13 Atl. 427]); and in the absence of such a doubt the court is not required to submit the question of the defendant's present insanity to a jury in advance of the trial. (*People* v. *Geiger,* 116 Cal. 440 [48 Pac. 389].)' " (See, also, *People* v. *Keyes,* 178 Cal. 794 [175 Pac. 6].)

A denial of the motion and request was held not to be erroneous. The facts of that case presented stronger reasons for the submission of the issue of defendant's sanity to a jury than are to be found in the instant case. Here, no specific request was made to submit the issue of defendant's sanity to a jury and the motion for a continuance came after the defendant had put in a part of his case. No affidavit was here made or presented by counsel, as in the case above cited, to the effect that the defendant, in the opinion of counsel, was insane, or that counsel was unable to converse with his client or obtain from him information necessary to the presentation of his defense or to otherwise guard his rights.

The facts of the case necessary to an understanding of the points presented may be briefly stated. Mrs. Eva Foley, a widow and the mother of the girl upon whom the offense was committed, resided at San Leandro, Alameda County. Three daughters resided with her. The defendant, who was about thirty years of age, married the eldest daughter when she was of the age of about sixteen years. Shortly after marriage, he and his wife made their home with the mother of his wife. A separate room was assigned to them. The other children shared bedroom space with the mother. The daughter upon whom the offense was committed slept alone on a cot placed near the door which opened from the bedroom into a hallway. The defendant, on the early morning of November 30, 1923, at about the hour of 4 o'clock, left the room which he, his wife, and his infant child of the age of about two months were occupying, entered the room in which the eleven year old child was sleeping and, without awakening the mother or any other member of the family, committed a lewd and lascivious act upon the body of said female child.

That the defendant committed the offense charged, there seems to be no serious dispute. He was accused by the mother, to whom the child in a trembling and frightened con-

dition made immediate complaint. A warrant was issued
for his arrest within a few hours after the commission of
the offense and he eluded the officer by concealing himself
in the basement of his mother-in-law's house. Knowing
that the officer was in search of him, he attempted to per-
suade the mother of the child to have the charge which had
been lodged against him dismissed. He admitted his in-
decent conduct upon the body of the child to both the
mother and the city marshal of San Leandro. In addition
thereto, the linen upon which the child was sleeping was
examined by a bacteriologist and human, male spermatozoa
stains were found upon the sheets. The commission by the
defendant of the lewd and lascivious act, as charged, was
established by the evidence beyond all reasonable doubt.

It must be accepted as a fact, found by the jury, that the
defendant was responsible to the law for his act. There
is absolutely no substantial evidence in the record that even
tends to show that the defendant was affected by any kind
or degree of insanity which the law recognizes as an excuse
for the commission of interdicted acts, either at the time
of, or prior to the commission of the crime. [3] For in-
sanity to be available as a defense to crime it must be shown
by a preponderance of the evidence that the accused did not
know the nature or the quality of the act which he com-
mitted, or if he did know the nature and quality of the
act, that he did not know that it was wrong to commit it.
The kind and degree of insanity available as a defense to
crime has many times been defined by the decisions of this
court. Before it may be available as a defense, "it must
appear that the defendant, when the act was committed,
was so deranged and diseased mentally that he was not
conscious of the wrongful nature of the act committed.
If he has reasoning capacity sufficient to distinguish between
right and wrong as to the particular act he is doing, knowl-
edge and consciousness that what he is doing is wrong and
criminal, and will subject him to punishment, he must be
held responsible for his conduct. Although he may be labor-
ing under partial insanity,—as, for instance, suffering from
insane delusion or hallucination,—still, if he understands the
nature and character of his action and its consequences,—
if he has knowledge that it is wrong and criminal, and that
if he does the act he will do wrong, such partial insanity or

the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts.'' (*People* v. *Willard,* 150 Cal. 543 [89 Pac. 124]; *People* v. *McCarthy,* 115 Cal. 255 [46 Pac. 1073].). The conduct of the defendant, instantly following the commission of the crime and at all times thereafter, conclusively shows that he was conscious of doing wrong and that he appreciated the nature and the quality of the act at the time he committed it.   **[4]**   Added to what we have already said, it may be proper to observe that ''in our courts of law, there is no such doctrine established or recognized as moral insanity distinguished from mental derangement, as an excuse for crime, and as an exemption from punishment  therefor. There is no such type of insanity recognized in our courts as, for instance, that a person may steal your property, burn your dwelling, murder or attempt to murder you, and know at the time that the deed is a criminal act, and wrong in itself, and deserves punishment, having the ability to correctly reason on the subject, and yet be held guiltless and not punishable, on the ground solely of a perversion of the moral sense.'' (*People* v. *McCarthy, supra.*)   **[5]**   The burden of proof is always upon the defendant, or upon the person who asserts the insanity of another, to establish its existence by a preponderance of evidence.  This universal rule is applicable to the issue of mental unsoundness or irresponsibility in every case in which it may possibly arise and it has been ''the established rule in this state practically since its earliest history, repeatedly affirmed by this court, so that it cannot be considered as open to further question.  It was first established as the correct rule to be applied in this state in *People* v. *Myers,* 20 Cal. 518, and has been adhered to ever since. . . . '' (*People* v. *Willard, supra.*  The citation of many cases follows.)  Under the evidence in this case it is unnecessary to further pursue the question of the defendant's responsibility to the law at the time he committed the crime.  He signally failed to meet the burden which the law imposed upon him.  This brings us to a consideration of whether or not the court abused its discretion by omitting to suspend the trial and submit the question whether or not the defendant was then sane.

**[6]**  Defendant's counsel did not at any time make a request or motion that the jury be discharged or that the

trial be suspended and the question of sanity be submitted to a jury as provided by section 1368 of the Penal Code. He seemed to prefer that the jury in whose presence the episode earlier mentioned occurred be retained to pass upon the question of insanity as it affected the defendant's legal responsibility at the time he committed the offense and requested a continuance to give him time to prepare a defense upon the theory of insanity. The court did, however, excuse the jury and took medical testimony as to the then mental condition of the accused. The defense offered three medical witnesses who had had more or less experience with nervous diseases, including epilepsy and so-called "shell-shock" effects, as to the defendant's mental condition and the people offered two. No alienist on either side was willing to give it as his opinion that the defendant was affected with epilepsy. In fact, neither the history of the case showed, nor were the symptoms which distinctly mark well-recognized types of epilepsy exhibited by defendant at the times he was thought to be passing through some sort of nervous disturbance. Medical experts testified that he appeared upon two or three occasions to have been in a state of nervous tremor resembling epilepsy, which they diagnosed as a disturbance superinduced by "shell-shock." They had also seen him at times when they believed him to have been in a stupor. There was also evidence as to a reduction of ten points in his blood pressure and his pulse was 100 as against 80 or 90 when in the condition described by one of the experts as stupor. Other conditions and symptoms were described, but as the defendant's condition at the trial was at best temporary and not permanent, or settled insanity, it is not necessary to go further into details. No claim was made that he was a victim of settled or general insanity or that he lapsed into unconsciousness for any very considerable period of time. Prior and subsequent to his war experience defendant had been a sailor, had worked as a carpenter and had performed general labor. He was actively employed at the time he committed the offense.

The testimony of the experts called on behalf of the defendant which may be said to give color to the claim that the accused was insane at the trial is somewhat lacking in positiveness and definiteness as to the nature of the nervous trouble from which the accused was suffering, and

also as to the effect of the disturbances upon his mental faculties as affecting responsibility for his acts, and is attended with considerable speculation. As we understand them none claimed that the accused was in a state of continuous unconsciousness or incapacity. The defendant had but two paroxysms so far as the observations of the experts went, and reason and consciousness returned after the effects of the spells passed away. Both occurred after the defendant's arrest and during his incarceration in jail. As against the experts called by the defense the people called two. One was an alienist of many years' experience in both public and private institutions for the care and treatment of the insane. He had conversed with the accused at length upon the subject of the offense with which he was charged and had made close observation of him and was present in the courtroom at the time he lapsed into a "spell" while testifying. He went to the aid of the accused, examined him and applied several mental tests. His testimony is that in his opinion it was a clear case of malingering or feigning insanity. He stated positively that the defendant did not exhibit a single symptom of epilepsy or any other mental disorder. He was of the opinion that the accused was not then insane and never had been insane. The reasons for his opinion were stated at great length. The second expert called by the people was familiar with the form of nervous disorders commonly called "shell-shock" cases. His testimony corroborated the theory advanced by the first. Thus it will be seen that a sharp conflict was created as to the mental soundness of the accused. Aside from expert testimony there was much other evidence in the case. The appearance and actions of the accused, the testimony given by him, and his manner upon the stand, as well as the testimony of other witnesses touching his mental condition, were all before the court. With the aid which the foregoing opportunities afforded, it was the province of the trial court, in the exercise of a sound discretion, to determine whether the mental condition as exhibited by the defendant was assumed or real. We have examined the evidence with care and entertain no doubt but that the conclusion reached by the trial court to the effect that the defendant was at all times sane is amply supported by the record and it did not abuse its discretion by refusing to submit that issue specially to a jury.

[7]  The question of whether there exists a doubt sufficient to require the trial court to submit the issue of the sanity of a defendant to a jury during trial is one that must always rest largely within the discretion of the trial court. On principle, the question is not unlike the discretion which the law reposes in a court when it is called upon to pass upon the competency of witnesses to testify as to the sanity of persons generally, under section 1870, subdivision 10, of the Code of Civil Procedure. This question arose in *People* v. *McCarthy, supra,* on the claim made by the defendant that the court had abused its discretion in permitting certain persons to testify as to the mental condition of the accused on the theory that they were within the section which permits "intimate acquaintances" to give their opinions with respect to the mental sanity in all cases where that question is an issue. Speaking of the question of judicial discretion this court said:

"In the determination of this question, as in that of any other fact from oral evidence, he [court], of necessity, must be conceded to be the best judge of what the evidence shows, since he has before him many elements of fact which cannot be transmitted to paper, but which enable him to more correctly weigh the evidence, and exercise a wiser discrimination as to what it shows than one who reads but a naked statement of the evidence, without the presence of the witness. And so it has been held, and wisely, that the trial judge is to be accorded wide discretion and latitude in this respect; and his ruling will not be disturbed except where the evidence is so lacking as to leave no just room for question that the discretion has been improperly exercised. (*People* v. *Pico,* 62 Cal. 53; *Estate of Carpenter,* 94 Cal. 414 [29 Pac. 1101]; *People* v. *Lane,* 101 Cal. 516 [36 Pac. 16]; *People* v. *Schmitt,* 106 Cal. 52 [39 Pac. 204].)"

Counsel has cited as an authority in this case, on the point that the trial court abused its discretion, *People* v. *West,* 25 Cal. App. 369 [143 Pac. 793]. It is not necessary for us to comment on what is said in that case as to the effect of judgments and commitments of persons to hospitals for the care and treatment of the insane. The effect of such judgments was fully discussed by this court in *People* v. *Willard,* 150 Cal. 543 [89 Pac. 124], and we have no disposition to depart from the rules there announced. But

nothing is said in *People* v. *West, supra,* that helps appellant. The facts before the court in that case are so widely different from the facts of the instant case as to make extended discussion unnecessary. In that case West, who was serving a sentence for the commission of a crime at San Quentin, was, by an authorized board, adjudged insane and committed to a state hospital. Shortly after his arrival at the hospital he and another inmate took the life of a fellow inmate. Both were charged with homicide. Before the trial the defendants regularly moved the court that the question of their present sanity be submitted to a jury as provided by section 1368 of the Penal Code. In support of said motion the defense introduced and read the affidavit of one of their counsel. From the affidavit it appeared that both defendants were under commitment to the hospital as insane persons and were being treated as such. It was also averred by said counsel that both he and his associates "have each made efforts to secure from the said defendants some statement concerning the crime charged in the information; that said defendants refuse to say anything about the facts or circumstances of the offense and act as though suffering from delusions of some character; that affiant therefore alleges that it is his opinion that both of these defendants are mentally insane; and that neither of them is mentally competent to make a just and rational defense to the charge made against them."

It was further represented by counsel, in a statement to the court of appeal, that the defendants "continued in such a state of mental derangement that attorneys appointed by the court to defend them could obtain no assistance from the defendants in the conduct of their case." In the instant case no suggestion was made to submit the question of defendant's sanity to a jury until the people had closed its case and the defendant had examined two witnesses on the second trial. But the most material difference between the two cases consists in the fact that the defendant in the instant case was *not under commitment to a state hospital* and his attorney did not make an affidavit that he was unable to obtain assistance from him or information necessary to enable him to properly present his defense. The information which forms the basis of the expert witnesses' opinions shows that they rested largely upon the personal history

of the defendant. which, unquestionably, was furnished by him. Besides, the record is convincing as to his ability to give ample aid to his counsel. In the face of the record before us the affidavit made in the West case could not have been made in the instant case. With all of the elements which controlled the decision in the West case absent in the instant case, and there being no corresponding elements present, no grounds remain which would support a finding that the trial court abused its discretion by omitting to submit the issue of sanity to a jury.

Upon the defendant being called before the court for sentence, some twelve days after his conviction, his counsel requested that before the pronouncement of judgment the question of his insanity be submitted to a jury. The court yielded to this request and two days thereafter a jury returned a verdict pronouncing him insane and a proper person for care and treatment at a state hospital. He was detained at the hospital for a period less than thirty days and returned to the court as restored to sanity. The physician at the hospital believed him to be insane during the first four or five days after he was received into the hospital and pronounced his ailment "psychoneurosis, hysterical attacks." Defendant did not give any information as to himself and when he did answer questions he employed monosyllabic words. He was in a "stuporous state." He constantly twitched his mouth or "blinked his eyes." The physician said that if the defendant exhibited at the trial the same symptoms which he exhibited upon the first days of his confinement at the hospital he "would say that he was insane." The testimony of the expert excluded epilepsy, or settled insanity, or dementia. No delusions were shown to exist at any time. The treatment the defendant received at the hospital was continuous bathing. Also a spinal puncture was made to draw fluid from the spine. On the next day thereafter defendant cleared up and remarked: "I am out of my dream or stupor. I have waked up." The attendant further testified that his nervous trouble was transitory and by the symptoms which he exhibited while under his care he was unable to say what his mental condition was during the trial, or two weeks prior to his admission at the hospital or at any other time prior thereto. [8] A judgment committing a person to a state hospital for the

care and treatment of the insane is not final and conclusive upon the question of criminal responsibility, or the ability of a person so committed to conduct his defense in a rational manner. This rule is unequivocally announced in *People* v. *Willard, supra,* and *In re Buchanan,* 129 Cal. 330 [50 L. R. A. 378, 61 Pac. 1120]. It is sufficient to say, in the light of the testimony of the attending physician, that as the alleged insanity of defendant was not permanent or habitual, no presumption can be indulged that it had an existence two weeks prior to his commitment. (*People* v. *Keyes,* 178 Cal. 794 [175 Pac. 6].)

At the time it pronounced judgment upon the defendant the court expressed a belief that he was sane at the time the postponement was requested and also at the time he appeared and asked for a submission of the question of his sanity to a jury, but that he yielded to the request merely out of an abundance of caution. Before judgment was pronounced the court made inquiry of the defendant for the information touching his birth, age, parentage, domestic relations, habits, avocation, and such facts as would tend to indicate the causes of his criminal character, as required by the provisions of section 1192a of the Penal Code, and the defendant's replies in furnishing said information were as apt, intelligent and coherent as might be expected of a person of average normal mind. We are of the opinion that the trial court did not abuse its discretion.

The judgment and order appealed from are affirmed.

Richards, J., Shenk, J., Waste, J., Lawlor, J., and Myers, C. J., concurred.

Rehearing denied.