[Crim. No. 4833.   In Bank.   Dec. 29, 1948.]

THE PEOPLE, Respondent, v. ERWIN M. WALKER, Appellant.

Hindin, Weiss & Girard, Fred Girard and Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

CARTER, J.—A rehearing was granted in this case to give consideration to new points raised for the first time in the petition for rehearing. We will first restate our original opinion without substantial change.

Defendant has been convicted of the murder in June, 1946, in Los Angeles, of Police Officer Loren C. Roosevelt, and of the attempted murder in April, 1946, of two other officers. The appeal from the judgment of conviction of murder is automatically before this court by virtue of the provisions of section 1239 of the Penal Code. Appeals from the judgments of conviction of attempted murder are not here presented.

To the murder charge defendant pleaded not guilty by reason of insanity and alienists were appointed to examine him and report on his mental condition. When the cause was called for trial defendant waived a jury.

On appeal defendant questions the sufficiency of the evidence to establish murder of the first degree, pleads for reduction of the crime to murder of the second degree, and criticizes a ruling of the trial court on the admission of evidence.

The evidence shows in substance the following: Defendant, now about 29 years of age, was a normal boy, above the average in intelligence. He was interested in radio work, was a good athlete, on the track team, graduated from Hoover School, and had one year at California Institute of Technology. He was thereafter employed by the police department as a radio operator. He lived with his parents and sister, was gentle, affectionate, considerate above the ordinary for the welfare of others, and gave no trouble in any way.

In 1941, he entered military service and served in the Pacific area. After graduating from officers' training school in Australia with rank of second lieutenant, he was assigned, by reason of his technical knowledge, to a small group of men engaged in radar repair and maintenance in advance invasion areas. After some service on other islands he was sent to Wake Island about June, 1944, and stayed until

November, 1944. While there he was subjected to Japanese bombardment for some days and nights. With his personnel he found some thousand dismembered, decomposed Japanese bodies strewn over the area. The stench affected the men's ability to rest, sleep, and eat. The practice prevailed for a while among the enlisted men of preparing the heads of Japanese so that the skulls could be shellacked and used for desk ornaments.

Defendant moved to Leyte Island about November, 1944, and participated in a portion of the invasion of that island after bombardment. He and another officer selected a campsite and took some security measures for the safety of about 85 men, but did not post a day guard because of orders which had been received. Defendant was sent back to his ship under orders and when he returned to the island he learned that there had been a Japanese sneak attack at dawn and that his closest friend had died under conditions of valor. He claims he felt an overwhelming sense of guilt for failure to take further security measures, although all of the officers were cleared by investigation of any lapse of duty. Thereafter defendant and his group were subjected to approximately three days and nights of continuous battle by reason of the invasion of Japanese paratroopers, and this despite the fact they were not a combat but a signal corps company. Up to this time defendant was well liked by all the men who worked with him, and was reputed to be more than usually considerate of them.

After the Leyte occurrence defendant felt he could not serve as an officer and asked to be permitted to return to the United States. He was released from active duty in the South Pacific in December, 1944, but was promoted to first lieutenant in July, 1945, about three months after his arrival in the United States. There was a progressive change in his temperament for the worse after he left Leyte.

Early in 1945, while still on active duty, defendant burglarized a garage, taking a set of tools, voltmeter and radio tuner. In August, 1945, he entered the ordnance warehouse at night and stole six Tommy guns, twelve .45 automatics, six .38 revolvers, ammunition, holsters, and clips. He was discharged from the Army in November, 1945. During his first week of terminal leave, he stole an automobile, changed the license plates, and used it to transfer some of the stolen goods. From a men's store, he stole civilian clothes. From record and film com-

panies he stole amplifiers, electronic equipment, records, projector, recording turntable, camera, and other equipment. He rented a garage and fitted it up as an experimental workshop. His burglaries continued and yielded funds for living as well as other property.

He never returned to live with his family. They found him a changed person mentally and physically from the boy they had known. He was morose, melancholy, taciturn, brooding, rough with small children, secretive, and difficult. He took several small jobs,. but quit them. He generally carried a machine gun.

An attempted sale by defendant in April, 1946, of equipment taken in one of the burglaries, gave the police a clue to his identity and whereabouts. Two officers attempted to effect an arrest but defendant shot his way out, thus committing the attempted murders of which he was found guilty. In May, 1946, defendant burglarized another establishment, taking from it a roll of safety and detonating fuse and a roll of priming cord. With the thought of blowing safes and cutting locks, he made nitroglycerine out of fuming nitric acid, sulphuric acid and glycerine.

In the early dark of a morning in June, 1946, defendant drove to a meat market, and preparatory to an attempt to blow the safe in it, he severed the lock on the gates with bolt cutters and put on his own padlock. He then hid the bolt cutters in an adjoining area, got into his car, and drove around the block to see if he had been observed. Not seeing anyone, he retrieved the bolt cutters and returned to his car, again driving around the block. He saw someone with a flashlight in the vicinity where he had hidden the cutters. He turned his car at the second street past the meat market and parked it half way down the block. He then walked back and saw the person with the searchlight enter a car and drive it toward him. It drew up directly opposite him and he saw that the driver was an officer. The officer called defendant to the car and asked what he was doing in the neighborhood. Defendant told some story about seeing a girl friend. The officer, sitting behind the steering wheel with a flashlight in his left hand and his right hand on the butt of his gun, asked defendant for his identification. Defendant slowly drew his loaded .45 automatic from under his belt and pointed it at the officer, who then whipped out his own revolver. Defendant shot twice at the officer, ducked, and ran, abandoning his own car. The officer died in the hospital a few hours later. Defend-

ant's abandoned car was found to contain bolt cutters, a loaded Thompson submachine gun, a bag of tools, sap, sash cord, bell wire, hacksaw blades, hand drill, electric drill, crescent wrenches, pry bar, extension cord, hammer, pliers, wire cutters, nitroglycerine, adhesive tape, percussion cap crimped to a 4 x 4 white blasting fuse and a primer cord attached to the percussion cap.

After the murder defendant gave up the idea of blowing safes and worked at several jobs for brief periods. He then experimented with making California license plates and drivers' licenses, which could be used in selling "hot" cars. He had theretofore stolen various cars. In December, 1946, he started robbing liquor stores. These crimes led to his apprehension by the police, although he attempted to resist arrest with a Thompson submachine gun. After arrest defendant gave detailed confessions regarding his commission of numerous crimes.

Whether defendant embarked on his career of crime with an idea of making society support him and pay for his suffering, or whether he did it, as he claims, under an aberration, was an issue for the trial court. Defendant asserts that although he had been told that his best friend had been killed in the dawn attack on Leyte Island, nevertheless he either met this friend as a stowaway on the transport home, or else had a vision or hallucination of meeting him; that the two decided that the blame for the war lay at the door of the industrialists and evolved a plan to prevent any future similar occurrence. Defendant told his friend of an idea he had of inventing an electronic radar gun, which by shooting a beam would disintegrate metal into powder, and by which they could seize control of the government and enforce legislation which would increase the cost of war to a point where it could not profitably be waged, effecting this primarily by raising to a high level the salaries paid to soldiers.

Defendant testified that he was to meet his friend after his discharge, but the friend never appeared; that he committed his series of thefts with the idea of securing the equipment to proceed with his invention and protect it; and that even in wounding and killing the police officers, he thought the sacrifice was justified by his plan to forever end war. Defendant said that later he came to the realization that his idea was "strictly screwball," too farfetched and foolish to expect anyone to believe it; that it would need very ultra short frequencies to upset a molecular structure, which

could not be obtained by normal radio means; that he was attempting to develop means whereby such frequencies could be developed between light rays and longer radio waves.

The way in which defendant planned and effected his crimes and his success in eluding capture for so long a time showed a keen mentality. After he was arrested his family revealed to him a long history of insanity in both branches of the family. A great-great-great-grandfather was insane for nine months. A great-great-grand-uncle, great-great-grand-father, and great-grand-aunt also spent time in the insane asylum. A great-grandfather committed suicide, as did a grand-aunt. A grandmother is confined at Patton. A grand-aunt had hallucinations. A cousin is mentally retarded; the father a psycho-neurotic.

Dr. R. O. Lieuallen, a member of the staff of the Norwalk State Hospital, appointed by the court to examine defendant, testified that after taking into consideration both the family and personal history of defendant, he believed that it was evident that defendant had a bad family background, and an unstable nervous system; that it was difficult to evaluate just how much his home environment or service experience had helped to precipitate his criminal conduct, but in his opinion defendant was sane at the time of commission of the murder and at the time of trial. Upon being shown an exhibit which charted the family history of insanity the doctor admitted it was worse than he thought it was but that it did not change his opinion. Upon objections by defendant on the ground of remoteness of time of examination (February-March, 1947) from time of commission of the murder (June, 1946), the doctor also admitted that it was possible for defendant to have been insane during the period of criminal activity and to have recovered his sanity at time of examination, but he reiterated his opinion that defendant was sane, and that the story told by defendant of the appearance of his friend on board the ship did not "ring of the true delusion or hallucination"; then at some length he explained why it did not ring true.

Two other doctors examined defendant and also reached the conclusion that although he was emotionally unstable, he was sane both at the time of his commission of the murder and at the time of their examination.

Dr. Lieuallen, on redirect examination, was asked whether his report would have been different in some respects if at the time he had had the full details of defendant's family

background. He replied: "I probably would have mentioned more about the family background, but I do not think it would have changed my conclusion about it." Then when asked if it would have produced "a doubt in your mind as to his possible sanity," the court sustained an objection to the question as having been asked and answered. This ruling is assigned as error. However, the record shows that the second question was a repetition, in slightly different form, of the previous question, and that the doctor had also reiterated that he did not believe that his conclusion would have been changed. The ruling was not erroneous, much less prejudicially so.

Defendant contends that in view of his family background and the impact of his war experience upon his mentality, this court should reduce the crime to second degree murder; that "aberration naturally resulting from defense of one's country, from a moral viewpoint should be viewed by the courts with more favor." This appeal to sympathy cannot avail defendant. It is similar to the plea of "shell-shock" which was raised by a veteran of the first world war in *People* v. *Gilberg,* 197 Cal. 306 [240 P. 1000]. As this court there said (p. 313): "It must be accepted as a fact, found by the jury, that the defendant was responsible to the law for his act. There is absolutely no substantial evidence in the record that even tends to show that the defendant was affected by any kind or degree of insanity which the law recognizes as an excuse for the commission of interdicted acts, either at the time of, or prior to the commission of the crime." It is well settled that insanity cannot be used for the purpose of reducing the degree of the crime of murder (*People* v. *French,* 12 Cal. 2d 720, 737 [87 P.2d 1014]). Under defendant's plea of not guilty by reason of insanity, the only issue was his sanity, and that was resolved against him. The record affords abundant support for the conclusion that he was sane.

At the time the court was considering the fixing of the degree of the crime, the district attorney expressed the belief that the murder was of the first degree because it was committed in the course of perpetration of a burglary and also, although there was some conflict in the evidence on the issue, because it was a wilful, deliberate killing. The court commented in substance that although the record might well support a finding that the killing was wilful and deliber-

ate, nevertheless he would rest his finding upon the one basis of a first degree murder committed in the perpetration of an attempted burglary.

Defendant argues that the killing was more in the nature of a killing in the commission of assault with a deadly weapon than in the attempted perpetration of a burglary; that the burglary had been abandoned at the time of the murder for then defendant's sole purpose was to disarm the officer so as to evade arrest for the prior shooting of two other officers.

The evidence, however, supports the court's view. At the time of the murder defendant had already snipped the bolt on the door of the meat market and replaced the lock, and he was scouting the neighborhood to see that the coast was clear; in other words, he was in the process of completing his attempted burglary after commission of a definite overt act. A killing in an attempt to perpetrate a burglary is murder of the first degree (Pen. Code, § 189). ▆ A failure to complete a crime because of threatened arrest or the appearance of the police is not such a free and voluntary act as to constitute an abandonment (*People* v. *Corkery*, 134 Cal. App. 294, 297 [25 P.2d 257]). ▆ Moreover, the record also supports the conclusion that the killing was wilful, deliberate and premeditated. As the trial court remarked at the time of imposing the death penalty, ''I feel that when the defendant shot and wounded Officers Forbes and Johnson he felt that he was coming to the end of his rope and that it was either him or them, and I believe even more so when he shot Officer Loren Roosevelt in the car that that same thought went through his mind, that this was the crucial point in his life; that if Roosevelt got the drop on him and captured him, that all of his past career would come up to him, but that if he succeeded in getting Officer Roosevelt out of the way, he would have another chance. However, I believe that in addition to my finding that the killing of Loren Roosevelt was murder. in the first degree as a matter of law, I feel that it was a deliberate killing, a purposeful killing on the. defendant's part.''

The sufficiency of the evidence to support the finding of sanity is not questioned. Defendant himself testified at great length on the trial. He showed a mentality and scientific learning far above the average. The concern of the trial court over the case is reflected in his remarks at the close of the trial and at the time of imposing sentence of death. Among other things he said: ''This is a case in which I feel my

responsibility very greatly . . . The defendant, of course, in his lengthy time on the witness stand here showed a high degree of intelligence. I seldom recall a more intelligent witness, a witness who gave clearer responses to the questions than did Mr. Walker. It is true that he had a war experience that, in the vernacular of the service men, might be termed rugged, but without analyzing it or comparing it too much, I would say that perhaps millions of his fellow Americans had experiences that were equally rugged during the war. Furthermore when the defendant came home and back to his country, apparently his services were so satisfactory that after his return home he received a promotion so that there certainly could not have been any important effect that way. The whole course of conduct of the defendant as testified to by the defendant and by the witnesses shows to my mind intelligence and plan far beyond anything that is usually seen in a case of this type . . . Now, we come to the question of hallucinations . . . I frankly cannot accept the idea of the hallucinations, because it does not fit in with the rest of the testimony; it doesn't fit in with his plans and it doesn't fit in with any number of things . . . I am convinced affirmatively that the defendant was at the time of the commission of the acts charged in the indictment and is now legally sane . . .''

In fixing the penalty, the court further said, ''The decision that I have to make in this case is the most difficult and solemn that ever faces a judge . . . I recognize the defendant's war service and the disturbing effect it may have had upon him; but as I also said yesterday, his service was shared by millions of other boys who have come back home and who have led and are leading normal lives. I recognize the fact that the defendant has what may be classified as an unstable personality; that he may be disturbed emotionally, but I think it would be true that most persons who choose for themselves a life of violent crime are unstable and disturbed. I believe that that cannot enter into our deliberations . . . It seems to me that this defendant has shown by his own testimony on the witness stand, by the story of his life of crime, also by the statement that he has made to other officers that he is beyond the possibility of rehabilitation; that he will be a menace to society wherever he is, whether that is inside or outside the penitentiary. His remarks have indicated that if he were sent to the penitentiary on a sentence there he would immediately set about ways of getting out, and I think the chances are fairly good that he might be successful. Because

of a belief that this defendant will be a menace wherever he is, inside or outside of the prison walls, I very regretfully, I may say prayfully, fix the penalty in this case as the death penalty provided by law.''

Defendant asserts that his constitutional rights have been invaded and that certain sections of the Penal Code are invalid.

Section 1016 of the Penal Code provides that there are five kinds of pleas to an indictment or information and lists them. Number 1 and 2 are ''guilty'' and ''not guilty,'' respectively. Number 5 is ''Not guilty by reason of insanity.'' The section goes on to state that: ''A defendant who pleads not guilty by reason of insanity, without also pleading not guilty thereby admits the commission of the offense charged.'' Section 1026 provides that if there is a plea of not guilty as well as a plea of not guilty by reason of insanity, the trial on the former plea shall be held first. If he is found guilty or if he pleads only not guilty by reason of insanity, the insanity trial proceeds and if he is found sane ''the court shall sentence the defendant as provided by law.'' Defendant asserts that the provisions are invalid for the reason that if he only pleads not guilty by reason of insanity he is conclusively presumed to admit the commission of the offense—to be guilty—to have pleaded guilty and that such presumption cannot stand in the face of the rule of constitutional law requiring that there be some basis of probability for presumptions, citing *Tot* v. *United States*, 319 U.S. 463, 470 [63 S. Ct. 1241, 87 L.Ed. 1519]; *Adamson* v. *People of State of California*, 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]; *People* v. *Adamson*, 27 Cal.2d 478 [165 P.2d 3].

The factual background of the proceedings shows that defendant's rights were adequately protected at all stages thereof. Defendant's arraignment first came up on January 7, 1947, at which time he was without counsel and the arraignment was continued to January 14th. On that day defendant was present with counsel and defendant was arraigned and at his request the time to plead was continued to February 14, 1947. On that day defendant and his counsel were present and the minutes of the proceedings recite that ''defendant pleads that he is not guilty of the offenses charged because he was insane at the time that he is alleged to have committed said unlawful acts. Doctors David H. Fink, Edwin E. McNiel and M. J. Rowe are appointed under Section 1027 Penal Code to examine the defendant as to his sanity and

report to the Court as to his mental condition. The trial of the action is thereupon set for March 25, 1947, at 9:00 A. M. and transferred to Department 41.'' On March 20th, at the request of defendant, the trial was set for May 12th. On May 2d it was continued to June 2d, at which time it came on for trial. Defendant and his counsel were present and the following transpired: ''MR. GIRARD [defendant's counsel]: At this time the defendant consents to being tried by the court and waives his right to a jury trial. THE COURT: You do so waive your right to a jury trial, do you, Mr. Walker [defendant]? THE DEFENDANT: Yes. THE COURT: *You realize, the only plea which you have entered in this case is the plea of not guilty by reason of insanity, and that entering that plea without also pleading not guilty admits the commission of the offenses charged. You understand that?* THE DEFENDANT: *Yes.* THE COURT: You realize that if a jury is waived and you are found to have been sane, legally sane at the time of the commission of the offense, that then admits the commission of the offense; *there is nothing further to do but find you guilty;* you understand that? THE DEFENDANT: Yes. THE COURT: Also there being at least one count in this information being a charge of murder, you understand that it *is the court's duty to determine the degree of the murder in case you are found to be sane;* do you understand that? THE DEFENDENT: Yes. THE COURT: You understand that if it is determined to be murder in the first degree that *it is the court's duty to determine the penalty which may be life imprisonment or may be the death penalty; you understand that?* THE DEFENDANT: *Yes.* THE COURT: I asked these questions *before when it was suggested you were going to waive a jury.* I will ask them all again. There have been no promises or indications of any kind made to you as to what the court might find in your case, have there? THE DEFENDANT: No. THE COURT: And your counsel has not suggested to you, nor has anyone from the District Attorney's office suggested to you that any particular finding would be made in this case as to the degree or as to the penalty? THE DEFENDENT: No. THE COURT: And you understand, then, that if you waive a jury you are doing so without any qualifications or conditions of any kind; is that correct? THE DEFENDANT: That is correct. THE COURT: And you do so waive your right to trial by jury? THE DEFENDANT: Yes, your Honor. THE COURT: Clearly understanding all I have said? THE DEFENDANT:

Yes. THE COURT: Counsel waives? MR. GIRARD: Yes, I waive. MR. HENDERSON: The people waive, your Honor.''

Even if we speak of the contention as dealing with a presumption, defendant is not prejudiced. Certainly there is not a conclusive presumption, as to which it may be said that it is invalid, where the invocation of it, or whether or not it arises, *rests solely within the control and power of the defendant*. He has complete freedom of choice. He may plead both not guilty and not guilty by reason of insanity, and thus admit no guilt, but if he chooses to plead not guilty by reason of insanity only, the law (statute) says, in effect, that he has pleaded guilty to the charge. He is wholly free to prevent that result by merely making the additional plea of not guilty. There is no compulsion upon him to follow one course or the other. He is not presumed guilty unless he selects that course by his pleading. The whole matter is one of procedure. In *People* v. *King*, 28 Cal. 265, followed in *People* v. *Jocelyn*, 29 Cal. 562, the court was concerned with a statute which provided that if defendant's demur to an indictment is disallowed, the defendant must plead and if he does not the court shall pronounce judgment against him. The defendant refused to plead after disallowance of the demurrer and a plea of not guilty was entered by order of the court. Defendant seemed to think he was deprived of some constitutional right because of the entry of the plea in that way. The court said (28 Cal. 269): ''If, when arraigned, he stands mute or refuses to demur or plead to the indictment, a plea of not guilty is to be entered for him; but if he demurs and his demurrer is disallowed, he may plead or not, at his option, and if he stands mute or fail or refuse to plead, the court is to proceed as upon a conviction or a plea of guilty and pronounce its judgment accordingly. Such is the plain rule of conduct as prescribed by the statute. Is there any constitutional objection to it? By such a rule is the defendant denied any constitutional right or privilege? If so, we have been unable to discover it, and counsel for appellant has failed to suggest wherein the statute conflicts with the Constitution. The only clause of the Constitution to which it can be claimed that the rule of the statute is repugnant is that which provides that 'The right of trial by jury shall be secured to all, and remain inviolate forever.' This provision is designed for the protection and security of the citizen in his life, liberty and property, and to protect all three against the exercise of arbitrary power. Of the right thus solemnly

secured to him he cannot be deprived by any power under the Government. He may claim his right at all times and under all circumstances. But while the Legislature cannot destroy or in any degree impair his right, that body may provide the mode and manner of its enjoyment so far as the same may be done without prejudice to a fair and impartial trial in the manner pointed out and secured to him by the Constitution. The criminal law of the land must be enforced, or civil government is a failure, and the law of force becomes the rule of conduct. The intent of the Constitution is to secure every person charged with crime a fair and impartial trial by jury, but not to place it in his power to evade a trial altogether by standing mute and refusing to participate in it. In order that there may be a trial there must be an issue. If, by refusing to join issue, the accused may avoid a trial, he is thereby enabled to pervert a constitutional provision solely designed to secure to him a fair trial by a particular mode, but not to enable him by his own act to obstruct the course of justice and escape a trial altogether, into a shield against punishment for any crime which he may have committed.

"*It is within the constitutional power of the Legislature to provide that the Court shall enter a plea for the defendant when he stands mute, or that such standing mute shall be taken as a confession of the truth of the indictment, and equivalent to a plea of guilty.* Such a provision in no way deprives the defendant or tends to deprive him of his constitutional right to a trial by jury. If, in the case provided for in section two hundred and ninety-six, no trial takes place, and the defendant is adjudged guilty without the verdict of a jury to that effect, and punished, *such result is not attributable to the law, but to the wilful obstinacy of the defendant. That section affords him an opportunity to be tried by jury, which is all that the Constitution exacts from the Legislature.* If he chooses to stand upon his demurrer and fails or refuses to plead, he is no more entitled to trial than he would be upon a plea of guilty; and it is presumed that no one will contend that the law providing for a plea of guilty is repugnant to the constitutional provision in question." [Emphasis added.] That reasoning fits the instant case precisely. (See, also, *People* v. *Hickman,* 204 Cal. 470 [268 P. 909, 270 P. 1117]; *People* v. *LaCrosse,* 5 Cal.App.2d 696 [43 P.2d 596]; *People* v. *Pincus,* 131 Cal.App. 607 [21 P.2d 964]; *People* v. *Pettinger,* 94 Cal.App. 297 [271 P. 132].)

Without deciding whether it is necessary for the court

to advise defendant of the consequences of a single plea of not guilty by reason of insanity (see, generally on subject of advising the defendant as to the consequence of his plea, *People* v. *Mendez,* 27 Cal.2d 20 [161 P.2d 929]; 110 A.L.R. 228), it should be observed that here the defendant was represented by counsel and he personally made his plea. While the minutes at the time the plea was taken do not show that he was advised that a plea of not guilty by reason of insanity would result in an admission of the commission of the offense, the court stated that it had so advised defendant at the outset of the trial and fully warned defendant at that time as seen from the above quoted excerpt. He and his counsel had full opportunity at that time to request a change in the plea. Plainly the defendant's rights were fully protected at all stages and he was fully informed of his rights.

Defendant seems to argue that a statute which provides that a defendant is presumed to be guilty and sane, when he pleads not guilty by reason of insanity, violates due process and is vague and uncertain. That is merely another way of stating the problem heretofore discussed. The first alleged presumption has been discussed. The second presumption of sanity in the sanity trial has been held valid. (*People* v. *Hickman, supra.*)

■ Defendant argues that there is a violation of due process because there is no method under section 1026 of the Penal Code for determining the degree of the crime where the crime is divided into degrees. It will be remembered that by pleading only not guilty by reason of insanity defendant admitted the commission of the offense charged. The court then had the duty of fixing the degree of the crime and the punishment. (See, *People* v. *Greig,* 14 Cal.2d 548 [95 P.2d 936]; *People* v. *Kimball,* 5 Cal.2d 608 [55 P.2d 483].) The then applicable statutory provision reads: ''Upon a plea of guilty of a crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree.'' That proceeding involves no violation of the Constitution. (*People* v. *Chew Lan Ong,* 141 Cal. 550 [75 P. 186, 99 Am.St. Rep. 88].)

■ In connection with the last-mentioned contention it is further urged that constitutionally there must be a trial by jury to ascertain the degree of the crime after having what is tantamount to a plea of guilty (see foregoing discussion). However, section 1192 of the Penal Code states that the *court* shall fix the degree. Nothing is said about a jury. In

*People* v. *Chew Lan Ong, supra,* the same argument was made and it was said (p. 552) : "This is no new point. The same contention was made in this court forty years ago, and decided adversely. to appellant's claim.

"In *People* v. *Noll,* 20 Cal. 164, this court said: 'The proceeding to determine the degree of the crime of murder after a plea of guilty is not a trial. No issue was joined upon which there could be a trial. There is no provision of the constitution which prevents a defendant from pleading guilty (to the indictment) instead of having a trial by jury. If· he elects to plead guilty to the indictment, the provision of the statute for determining the degree of the guilt, for the purpose of fixing the punishment, does not deprive him of any right of trial by jury.'

*"People* v. *Lennox,* 67 Cal. 115 [7 P. 260], is to the same effect, and in *Hallinger* v. *Davis,* 146 U.S. 314 [13 S.Ct. 105, 36 L.Ed. 986], the supreme court of the United States declare[d] that a statutory provision conferring power on the court under such a plea, to determine the degree of crime violates no provision of the constitution of the United States.

"On the oral argument counsel made an additional point not presented in their brief, that this section is unconstitutional, because it does not provide any manner, or mode, whereby the court is to reach its determination as to the degree of crime; that it does not provide for the taking of evidence on the subject.

"Jurisdiction to determine the matter is, however, expressly conferred on the court by the section. This means that there shall be a judicial determination, and where power is especially conferred upon a court of general jurisdiction to determine a particular question, and no special mode for that determination is pointed out, the jurisdiction conferred necessarily implies authority in such court to call to its assistance in determining the particular question, the same aid as is usually employed by it in reaching a judicial determination in other cases.

"The universal aid is evidence. This was the means employed by the lower court in determining the degree of crime in the case at bar. It is the only means by which a judicial determination can be had, and was the means which it was contemplated by the legislature should be invoked by the court.

"If there could be any doubt of this general rule, we are satisfied that the course pursued by the lower court is provided for and sanctioned by section 187 of the Code of Civil Pro-

cedure, which declares that 'When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specially pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.'

"The method adopted by the lower court was entirely conformable to that spirit which provides for a judgment upon a conviction or plea of guilty of crime. If appellant's contention could prevail, a plea of guilty, generally, in those cases where the crime is divided into degrees—murder, burglary, arson—would be tantamount to immunity from punishment, because, as the determination of the degree of crime by the court is an essential prerequisite to the imposition of sentence, if the court is powerless to determine that degree, it is equally powerless to impose sentence, and hence, being unable to hold the defendant for any legal purpose, would be required to discharge him. This situation itself illustrates the wisdom of the general code provision, and the necessity for its application." (See, also, *People* v. *Hough,* 26 Cal.2d 618 [160 P.2d 549]; 8 Cal.Jur. 458.)

Further in connection with the foregoing it is claimed that the court could not use the evidence introduced at the sanity trial to determine the degree and punishment. Counsel for defendant in his presence stipulated that such evidence could be so used. Defendant cites no authority holding, and we have found none, that his counsel could not stipulate that the degree of the crime could be determined by the court on the evidence at the sanity trial. As seen in the forepart of this opinion the details and factors surrounding the crime were fully developed at that trial and were clearly sufficient to show murder of the first degree.

Still speaking of degree and punishment, defendant claims the court did not exercise true discretion in imposing the death penalty, for it remarked: "That he will be a menace to society wherever he is, whether that is inside or outside the penitentiary. His remarks have indicated that if he were sent to the penitentiary on a sentence there he would immediately set about ways of getting out, and I think the chances are fairly good that he might be successful. Because of a belief that this defendant will be a menace wherever he is, inside or outside of the prison walls, I very regretfully, I may

say prayfully, fix the penalty in this case as the death penalty as provided by law." Assuming the reasoning of the judge is pertinent, he also said he found the murder to be deliberate and premeditated from the facts of the case and there was ample to support his conclusion.

Finally defendant urges that it is not possible for defendant to waive a jury trial on the issue of insanity. (We have pointed out that both he and his counsel expressly waived it.) He bases this contention on the sentence in section 1026 of the Penal Code reading: "If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court." Plainly that provision is primarily concerned with the case where there has been a trial by jury on a not guilty plea. It is concerned with the question of whether the same or a different jury should determine the sanity question, *assuming the issue is to be tried by a jury.* It does not purport to forbid a waiver of a jury trial. (See, *People* v. *Cowan,* 38 Cal.App.2d 144 [100 P.2d 1079]; *People* v. *Rumsey,* 127 Cal.App. 272 [15 P.2d 780]; *In re Boyd,* 108 Cal.App. 541 [291 P. 845].) A trial by jury may be waived in all criminal cases by the consent of both parties expressed in open court by defendant and his counsel. (Cal.Const., art. I, § 7.)

On this appeal we have reviewed the entire record, including the proceedings on a motion for a new trial. We have been unable to discover any error justifying a reversal of the judgment or the reduction of the crime to that of murder of the second degree. We are therefore compelled to conclude that the judgment and order denying the motion for a new trial must be, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied January 27, 1949.