[Crim. No. 12926. Third Dist. Aug. 1, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
BETTY HORN, Defendant and Appellant.

COUNSEL

W. Ray Jones, under appointment by the Court of Appeal, and Jones & Stephens for Defendant and Appellant.

Quin Denvir, State Public Defender, Charles M. Sevilla, Deputy State Public Defender, Linda E. Shostak, Christina Hall, Roy M. Bartlett and Morrison & Foerster as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey, Nancy Sweet and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae for Plaintiff and Respondent.

OPINION

SPARKS, J.—■ "It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane." (*People* v. *Kelly* (1973) 10 Cal.3d 565, 574 [111 Cal.Rptr. 171, 516 P.2d 875].) But who is insane? In this case we explore that question by considering the type of showing which will support a finding of not guilty by reason of insanity under Penal Code section 25, subdivision (b), a new statute added to that code by the enactment of Proposition 8, the Victim's Bill of Rights, at the June 1982 Primary Election. Under this statute, a defendant is insane only when "he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (Pen. Code, § 25, subd. (b), italics added.) The central issue is whether the use of the word "and" rather than "or" reflects an intent of the people to reject California's version of the historic M'Naghten standard of insanity and adopt instead the "wild beast" test of antiquity. We conclude that it does not and consequently hold that the initiative measure reinstated the California M'Naghten right and wrong test as the measure of criminal insanity in this state.

Defendant Betty Horn stands convicted of vehicular manslaughter. (Pen. Code, § 192, subd. 3(a).) The trial court's express findings, however, establish that she was legally insane under the M'Naghten test at the time of the incident. Accordingly we reverse and remand with directions to enter a judgment of not guilty by reason of insanity.

FACTS

The factual circumstances are not in dispute. On the afternoon of September 17, 1982, defendant drove her automobile into the self-service island of

a Texaco gas station. She put $15 worth of gasoline into her car and then attempted to pay for it with a Triple A Towing Card. When told the attendant could not accept the card, defendant stated she must have left her credit card at home and offered to leave her driver's license at the station while she went to get money. The attendant refused to take the license as collateral and suggested defendant call someone to bring some cash to the station. Defendant agreed and used the telephone.

Defendant told the gas station attendant that someone was bringing money to her and the attendant suggested defendant move her car so she would not block the island. Defendant got into her car and drove out of the station. As she did so she almost struck another car. She then drove through a parking lot, across a cement border into a field, into another parking lot, and finally onto the road. An attendant from the gas station followed defendant on his motorcycle. He observed defendant travel at 80 to 85 miles per hour, and run a red light. Defendant continued at 80 to 85 miles per hour until she approached another red light. At that time she applied her brakes and slowed to about 60 miles per hour, and then entered the intersection. There defendant collided with another motorcycle and tragically killed the rider.

Defendant was charged with vehicular manslaughter. (Pen. Code, § 192, subd. 3(a).) She entered pleas of not guilty and not guilty by reason of insanity. (Pen. Code, § 1016, subds. 2 and 6.) Defendant waived a jury trial and submitted the issue of guilt to the trial court on the basis of the preliminary hearing transcript. Predictably, she was found guilty. The plea of not guilty by reason of insanity was then tried to the court.

During the sanity trial it was established beyond any doubt that defendant suffers from mental illness. Her family has a history of mental disease and she has been under treatment for mental illness for a number of years. Dr. Alfred French, a court-appointed psychiatrist, diagnosed defendant's illness as a manic-depressive disorder. The other court-appointed psychiatrist, Dr. Audrey Mertz, concurred and added that defendant's illness is a bipolar affective disorder. This means that she is subject to mood swings and may suffer from both the manic and depressive aspects of the disease at different times.

Defendant has been hospitalized from time to time for her illness, including a hospitalization as recent as July 1982. During her treatment for the disease defendant has been given lithium, which is one of the primary means of treating her illness. When she was discharged from the hospital in July 1982, her lithium treatment was discontinued.

Dr. French testified that in his opinion defendant would have been incapable of knowing or understanding the nature and quality of her acts and distinguishing right from wrong at the time of the accident. The discontinuance of her lithium treatment would cause her condition to deteriorate and lead to an increase in her manic state. This would result in the characteristics of impulsiveness, irrational thinking, grandiosity and irritability. This, coupled with the "provocation" she would perceive from being followed by a motorcyclist, would impair her ability to perceive her true situation accurately.

Dr. Mertz agreed that in the manic phase of her illness defendant would have difficulty determining right from wrong and in understanding the nature and quality of her acts. Her judgment, in Mertz' opinion, was seriously impaired so that she could not act in a responsible way.

Defendant testified at the insanity phase of the trial. It appeared that in the months before the accident her life had been in turmoil. Her husband had taken the children and filed for a dissolution. She had begun seeing Donald Parcher, who was a fellow mental patient, and he had mistreated her. She had been using her husband's credit card for living expenses, but had been required to return it. She had then begun selling her furniture to obtain funds. Shortly before this incident there had been a fire in defendant's residence.[1]

The night before the accident defendant had driven to Fresno. She spent the night with her sister and brother-in-law, and then left to return to Sacramento. On the way she was involved in a minor traffic accident. When she arrived in Sacramento she was out of gas and went to the Texaco station. Although she knew she had no money, she wanted her husband to come to the station and pay for her gas. When she called him, however, he either could not or would not come to the station. She then got into her car and headed towards a friend's house to obtain money. She observed the attendant from the station following on his motorcycle and was afraid of him, although she was not trying to get away from him. She remembered seeing the red light before the collision, but could not remember if she tried to stop. She did not see the motorcyclist before the collision.

Based upon this evidence, the trial court found that defendant was sane at the time of the accident. The court so found based upon its view that Proposition 8 added a more strict standard than any of the usual tests for insanity. The court expressly indicated that defendant "was legally insane

---

[1]As the result of this fire, defendant was charged with arson in a Placer County proceeding. In that proceeding defendant was found not guilty by reason of insanity.

under every standard known to the law except for the mental standard." The court said defendant was insane under both prongs of the American Law Institute (ALI) test; under the knowledge of wrongfulness prong of the M'Naghten Test, and under the so-called Durham or product test. The court further indicated that it would be prepared to find that at the time of the incident defendant was incapable of distinguishing between right and wrong by reason of her mental illness. Nevertheless, the court concluded that defendant had not sustained her burden of showing that she was also incapable of knowing the nature and quality of her act, and therefore ruled that she was not insane under Penal Code section 25.[2] Defendant was sentenced to state prison for the lower base term of 16 months.

### Discussion

This case squarely presents issues of the meaning and validity of Penal Code section 25, subdivision (b). In order to resolve these issues it will be necessary to recite a brief review of the history of the insanity defense.

"The starting point from an historical point of view is the ancient position which did not regard mental disorder, or insanity, as having any bearing upon the matter of criminal guilt." (Perkins on Criminal Law (2d ed. 1969) p. 850.) Eventually it became common, and finally a matter of course, for the king to grant a pardon to a person who committed a crime while insane. (*Id.*, at pp. 850-851.) During the time of Edward III (1327-1377), absolute madness became a defense to a criminal charge. (*Ibid.*) So long as insanity was not a defense and only enabled the accused to obtain a pardon, the law did not attempt to define insanity since it depended upon the king's grace. (*Ibid.*) When insanity became a defense to a charge of crime, it was generally held that the insanity must be total: the accused had to be wholly without the capacity to understand and remember in order to be innocent by reason of insanity. (Perkins on Criminal Law, *supra,* at pp. 851-852.)[3]

---

[2]The information alleged that defendant committed vehicular manslaughter by unlawfully and feloniously killing the victim "without malice but with gross negligence, as a proximate result of the commission by said defendant of an unlawful act, a violation of Vehicle Code Sections 22350 [speeding] and 21453a [failure to stop at a red signal], while driving a vehicle . . . ." In *People* v. *Shearer* (1970) 9 Cal.App.3d 74, 77-78 [87 Cal.Rptr. 811], we approved the definition of gross negligence in vehicular manslaughter as "the failure to exercise any care, or the exercise of so little care that [the jurors] are justified in believing that the person whose conduct is involved was wholly indifferent to the consequences of his conduct and to the welfare of others." (See CALJIC No. 8.92 (4th ed. 1979).) Presumably the trial court found that defendant failed to prove by a preponderance of the evidence that she was incapable of knowing or understanding that she was driving a motor vehicle with gross negligence.

[3]It should also be noted that when insanity came to be recognized as a defense to a charge of crime it was used as a last resort because the result of such a defense was hospitalization during the king or queen's pleasure, and "it so seldom pleased the monarch to do anything about the matter that the normal result was hospitalization for life, . . ." (Perkins on Criminal Law, *supra,* 850, 886.)

In the nineteenth century the celebrated case of Daniel M'Naghten arose. (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].)[4] M'Naghten had attempted to assassinate the Prime Minister of England, and instead succeeded in killing the Prime Minister's secretary. He was found not guilty by reason of his insanity. Because of the prominence of M'Naghten's intended victim, there was great public excitement and eventually the House of Lords put five hypothetical questions to the judges of the common law courts concerning the law of criminal responsibility. It was the judges' response to two of those questions which ultimately became the basis for the insanity test in all American states except New Hampshire. (See *People* v. *Drew* (1978) 22 Cal.3d 333, 341 [149 Cal.Rptr. 275, 583 P.2d 1318].) The response asserted: "[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case, supra,* 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].)[5]

The M'Naghten "right and wrong" standard was early adopted in California as the standard for an insanity defense. In *People* v. *Coffman* (1864) 24 Cal. 230, at page 235, the Supreme Court quoted the answer of the judges to the House of Lords as the proper test of insanity. (See Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and its Subsequent Development in the United States: A Historical Survey* (1966) 54 Cal.L.Rev. 1227, 1257.) Numerous appellate decisions can be found citing this test as the correct standard for criminal insanity, but it should be understood that the courts were never misled about what was really at issue. For example, in *People* v. *M'Donell* (1873) 47 Cal. 134, at pages 135 and 136, the court indicated that "[t]he true test of insanity is whether the accused, at the time of committing the crime, was conscious that he was doing what he ought not to do." Similarly, in *People* v. *Hoin* (1882) 62 Cal. 120, at pages 120 and 121, the court noted the inquiry is directed at the accused's knowledge of right and wrong in respect to the very act with which he is charged. Yet again in *People* v. *Willard*

---

[4]The courts and commentators have not always been consistent in the spelling of M'Naghten's name. We follow the lead of our Supreme Court and use the spelling in Clark and Finnelly's report of the case. (See *People* v. *Drew* (1978) 22 Cal.3d 333, 336, fn. 1 [149 Cal.Rptr. 275, 583 P.2d 1318].)

[5]The answer of the judges further declared: "If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong . . . ." (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210-211.)

(1907) 150 Cal. 543, at page 554 [89 P. 124], the court said that in order for insanity to be a defense "it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed." (See also *People v. Morisawa* (1919) 180 Cal. 148, 149 [179 P. 888]; *People v. Gilberg* (1925) 197 Cal. 306, 313 [240 P. 1000]; *People v. Keaton* (1931) 211 Cal. 722, 724 [296 P. 609].)

The insanity test based upon the M'Naghten case has generally become known as the "right and wrong" test. As Perkins explained, "[i]n the old days of the so-called 'wild beast test,' when criminal incapacity because of mental disorder required a total deprivation of mind and memory, the explanation was that such a person could not commit a crime because if he 'could not distinguish between good and evil, and did not know what he did' there was no 'wicked will and intention' (no mens rea)." (Perkins on Criminal Law, *op. cit. supra,* p. 860, fn. omitted.)[6] From this crude test, M'Naghten evolved: "And since this was the *reason* why such a person was incapable of committing crime it was only logical to take the position that one also lacked criminal capacity if he did not know what he was doing, or was unable to distinguish between right and wrong in regard thereto, even if his mental derangement fell a little short of a total deprivation of mind and memory." (Perkins on Criminal Law, *supra,* at p. 860.) Although various phrases have been used to set forth the M'Naghten test, "[i]n substance these all have reference to whether the defendant really knew what he was doing, and this is true whether we have in mind an extreme situation such as Stephen's illustration of a man who thought his homicidal act was 'breaking a jar,' [Stephen, *Digest of the Criminal Law,* art. 6, illustration (1) (8th ed. (1947)] or an inquiry whether there was an understanding of the 'real nature and true character of the act as a crime, and not . . . the mere act itself.' [*Brown* v. *Commonwealth,* 78 Pa. 122, 128 (1875)]." (*Ibid.,* fns. omitted.)

Although the M'Naghten right and wrong standard became the test for insanity in the majority of American jurisdictions, numerous criticisms were directed at it. (See *People v. Drew, supra,* 22 Cal.3d at pp. 341-343; *People v. Wolff* (1964) 61 Cal.2d 795, 800 [394 P.2d 959].) Some jurisdictions have modified or abandoned the M'Naghten test in favor of tests providing

---

[6]Under the "wild beast" test, in order for an accused to be exempt from punishment on the grounds of insanity, he "must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast, such a one is never the object of punishment; . . . ." (*Rex* v. *Arnold* (1724) 16 Howell St. Tr. 695, 765.) This "curious test" of insanity "harks back to language employed by Bracton in the thirteenth century. 'A madman,' he said, 'is one who does not know what he is doing, who is lacking in mind and reason, and who is not far removed from the brutes.'" (Hall, General Principles of Criminal Law (2d ed. 1960) p. 475.)

a broader scope of insanity. The primary manner in which the test has been modified has been by the addition of a volitional element, usually referred to as an "irresistible impulse" test, and also known as "moral insanity" or "emotional insanity." (Perkins, *op. cit. supra,* at pp. 868-870.) Under this test the accused may escape criminal liability for his acts regardless whether he was capable of understanding the nature and quality of those acts and that they were wrong, if he was unable to choose between right and wrong, or to conform his conduct to the requirements of the law. (Perkins, *supra,* at pp. 868-870.) In short, "this rule, broadly stated, tells jurors to acquit by reason of insanity if they find the defendant had a mental disease which kept him from controlling his conduct." (Goldstein, The Insanity Defense (1967) p. 67.) As we shall see, California's rejection of the irresistible impulse test came early (*People* v. *Hoin, supra,* 62 Cal. at p. 123), and has persisted. (*People* v. *Wolff, supra,* 61 Cal.2d at p. 812.)

Another test developed was the Durham [*Durham* v. *United States* (D.C. Cir. 1954) 214 F.2d 862 (45 A.L.R.2d 1430)], or "product" test. That test required the trier of fact to determine whether the accused was insane, and if so, whether the wrongful act was the product of his insanity. (See Perkins, op. cit. supra, p. 875.) The Durham formulation received little support from lawmakers and courts (*ibid.*), but a number of jurisdictions added the irresistible impulse test to the right and wrong test as the measure of criminal insanity. In *Leland* v. *Oregon* (1951) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002], the United States Supreme Court addressed the insanity issue. In that case it was contended that the Oregon scheme, which adhered to the right and wrong test and also required the accused to prove his insanity beyond a reasonable doubt, was unconstitutional. The court rejected the arguments on both counts. As to the right and wrong test the court said: "Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.'" (343 U.S. at pp. 800-801 [96 L.Ed. at p. 1310.)

From an early date the California Supreme Court was urged to adopt the irresistible impulse test as a means of determining criminal responsibility, but the court refused to do so. In *People* v. *Hoin, supra,* 62 Cal. at page

122, the court explained that there are three powerful restraints to a disposition to commit crime—the restraint of religion, the restraint of conscience, and the restraint of law. If a criminal disposition or influence may itself serve as an excuse for crime, then a most powerful restraint is withdrawn, that forbidding and punishing its perpetration. Accordingly, unless the impulse under which the deed was done was one which altogether deprived the accused of the ability to know that he was doing wrong, he is responsible for his actions. (62 Cal. at p. 123; see also *People* v. *Gilberg, supra,* 197 Cal. at p. 314; *People* v. *Morisawa, supra,* 180 Cal. at p. 150.)

In the latter part of this century the court continued to adhere to its acceptance of the right and wrong test as the sole California formulation of the insanity defense. Further, the court began to see the M'Naghten test as an integral part of our legislative scheme for the appraisal of criminal responsibility. (See *People* v. *Nash* (1959) 52 Cal.2d 36, 43-48 [338 P.2d 416].) Thus the court continually advised that arguments for a change of the insanity standard must be addressed to the Legislature rather than the courts. (See *People* v. *Rittger* (1960) 54 Cal.2d 720, 732 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Nash, supra,* 52 Cal.2d at p. 48; *People* v. *Berry* (1955) 44 Cal.2d 426, 433 [282 P.2d 861], overruled on another ground in *People* v. *St. Martin* (1970) 1 Cal.3d 524, 537 [83 Cal.Rptr. 166, 463 P.2d 390].) Despite such statements by the courts, the Legislature refused to act although on at least two occasions the issue was before it. At the time the decision in *People* v. *Wolff, supra,* 61 Cal.2d 795, was issued the Legislature had before it a bill which would have added an element of volition to the insanity test. (61 Cal.2d at p. 803, fn. 5.) And at the time of the decision in *People* v. *Kelly, supra,* 10 Cal.3d 565, the Legislature was considering revision of the Penal Code in a manner which would not have spoken in terms of the M'Naghten formulation. (See the conc. opn. of Mosk, J. at 10 Cal.3d at p. 580.) Nevertheless, no legislative change was made in the test of insanity as a defense to crime.

Although refusing to abandon the right and wrong test as the measure of criminal responsibility, the "California courts have not been unresponsive to such proposals for liberalization of the original language of the M'Naghten rule . . .; in evolving our own rule to meet statutory requirements, apply humane concepts, and at the same time protect society, we have reformulated the test with a variety of specifications to achieve this end." (*People* v. *Wolff, supra,* 61 Cal.2d at p. 800.) Thus, the courts have declined to construe knowledge of the nature and wrongfulness of an act as the mere ability to verbalize the "right" or socially expected answers when questioned. In order to be considered sane and therefore responsible for his actions, a defendant had to have the kind of knowledge that is relevant, namely an understanding or appreciation of the wrongfulness of his conduct.

(61 Cal.2d at pp. 800-801.) And this knowledge had to be in relation to the very act with which the defendant was charged. (*Ibid.*)[7] Citing its decision in *Wolff*, the California Supreme Court later summarized the test of insanity in California this way: "Insanity, under the California M'Naughton test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act." (*People* v. *Kelly, supra,* 10 Cal.3d at p. 574.)

At this point it is appropriate to note an anomaly in some of our decisional law. The cases have consistently placed emphasis, indeed the total emphasis, upon the cognitive ability of the defendant. (See *People* v. *Drew, supra,* 22 Cal.3d at p. 341.) The question was repeatedly phrased in terms of the defendant's ability to understand the wrongfulness of his conduct. (See *People* v. *Wolff, supra,* 61 Cal.2d at pp. 800-801 and cases cited therein.) Such ability was determined by reference to the M'Naghten formula: whether he could know the nature and quality of his act *or,* if he did know it, whether he could know that what he was doing was wrong. As Perkins points out, "a man who does not know what he is doing is in no position to distinguish between right and wrong in reference to the happening which he does not understand, although he might know what he is doing without being able to distinguish between right and wrong as to such an act. Hence the statement of criminal incapacity on this basis properly uses the word 'or' to connect these two, and it has been held reversible error to substitute 'and'." (*Perkins, op. cit. supra,* at pp. 861-862, fns. omitted.)

While California appellate decisions have always stated the test in terms of whether the accused could know the wrongfulness of his conduct, the courts have nevertheless from time to time been lax in their statement of the M'Naghten standard. It is thus not uncommon to find decisions anomalously approving language which states the M'Naghten test in terms of a lack of understanding of the nature and quality of the act *and* the inability to perceive the act to be wrongful. (See for example, *People* v. *Nash, supra,* 52 Cal.2d at pp. 42-43, fn. 3; *People* v. *French* (1939) 12 Cal.2d 720, 730 [87 Cal.Rptr. 1014], overruled on another ground in *People* v. *Valentine*

---

[7]This latter requirement was not a California innovation. The answer of the judges in the M'Naghten case which serves as the basis for the right and wrong test is generally only quoted in part. With regard to the ability to know the difference between right and wrong, the judges said: " 'The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused, at the time of doing the act, knew the difference between right and wrong, which mode, though rarely if ever leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to *the very act* with which he is charged.' " (See *People* v. *Hoin, supra,* 62 Cal. at p. 121; italics in original.) California adhered to this part of the test. (*Ibid.*)

(1946) 28 Cal.2d 121, 144 [161 P.2d 1]; *People* v. *Ricks* (1958) 161 Cal.App.2d 674, 677 [327 P.2d 209]; *People* v. *Ashland* (1912) 20 Cal.App. 168, 181 [128 P. 798].) Finally, in *People* v. *Richardson* (1961) 192 Cal.App.2d 166, at pages 172-173 [13 Cal.Rptr. 321], the Court of Appeal recognized the problem and held that it was error, although not reversible, to use the conjunctive "and" rather than the disjunctive "or" in stating the M'Naghten standard.[8]

In *People* v. *Drew, supra,* 22 Cal.3d 333, the Supreme Court reversed itself and judicially abandoned M'Naghten. In its stead the court decreed that trial courts should apply the test developed by the American Law Institute for its Model Penal Code, known as the ALI test. (22 Cal.3d at p. 345.) Under that test, "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." (Model Penal Code (Official Draft 1962) § 4.01.) This test alters the test for insanity in at least two major respects. First, it does away with the all-or-nothing language of M'Naghten,[9] and replaces it with a less stringent standard of substantial capacity. (22 Cal.3d at p. 346.) Second, it adds a volitional prong to the test by requiring the capacity to conform to legal requirements. (*Ibid.*) The court was not inaccurate when it described the ALI test as "a broad test of nonresponsibility." (*Ibid.*)

The ALI test was itself rejected four years later when the people exercised the legislative power through the retained right of initiative by enacting Proposition 8 at the June 1982 Primary Election. Among other things that measure enacted Penal Code section 25. For the first time in California's history, the defense of insanity was statutorily defined. (See *People* v. *Drew, supra,* 22 Cal.3d at p. 430.) Subdivision (b) of section 25 now provides: "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

---

[8]The original CALJIC instruction, number 801, on insanity as a defense to a criminal charge used "and" rather than "or". After the decision in *People* v. *Richardson* (1961) 192 Cal.App.2d 166 [13 Cal.Rptr. 321], pointed out the error, the instruction was changed. (See CALJIC No. 4.00, (3d ed. 1970).)

[9]" 'M'Naghten's single track emphasis on the cognitive aspect of the personality recognizes no degrees of incapacity. Either the defendant knows right from wrong or he does not.' " (*People* v. *Drew, supra,* 22 Cal.3d at p. 342, quoting *United States* v. *Freeman* (2d Cir. 1966) 357 F.2d 606, 618-619.)

 Although the insanity provisions of Proposition 8 are couched in the language of M'Naghten, the conjunctive "and" is used rather than the disjunctive "or" between the two prongs of the test. Defendant argues that Proposition 8 was not intended to create a new test of insanity, but was only intended to abrogate the decision in *Drew* and to return to California's version of the M'Naghten right and wrong test for criminal insanity. For reasons we shall explain, we agree.

The liberalization of the M'Naghten rule, which we have already described, reached its zenith in *Wolff.* There the court approved this "commendably broad interpretation upon the M'Naghten 'knowledge' test: . . . [¶] 'The test of sanity is this: First, did the defendant have sufficient mental capacity to know *and understand* what he was doing, and second, did he know *and understand* that it was wrong *and a violation of the rights of another?*'" (*People* v. *Wolff, supra,* 61 Cal.2d at p. 801; italics in original.) As can be seen, this test of *sanity* uses the conjunctive "and" construction. Conversely, the test of *insanity* necessarily must use the disjunctive "or" form. In order to be sane, "'the defendant must be able to know *and understand* the nature and quality of his act *and* to distinguish between right and wrong at the time of the commission of the offense.'" (*Ibid.*, italics in original.) Thus if a defendant knows and understands the nature and quality of his act but does not know it is wrong, he is, by definition, insane. Hence the reciprocal tests of sanity and insanity were correctly stated in CALJIC No. 4.00 (3d ed. 1970): "If you find that the defendant was capable of knowing and understanding the nature and quality of his act and, in addition, was capable of knowing and understanding that his act was wrong, you will find that he was legally sane. [¶] However, if you find that the defendant was not capable of knowing or understanding the nature and quality of his act, you will find that he was legally insane; or, if you find that he was incapable of knowing or understanding that his act was wrong, you will find that he was legally insane." The confusion over the correct usage of the conjunctive/disjunctive form of the M'Naghten rule thus arises from the failure to distinguish between the alternative definitions of sanity and insanity. This not uncommon confusion is evident in the Proposition 8 formulation of the M'Naghten test. We accept this blurred statement for what it appears to be, a careless draft, rather than divining in it some inexplicable regression by California's citizens to medieval barbarism.

We do not lightly disregard the fact that the word "and" is used in the statute. Nevertheless, "the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity." (*De Sylva* v. *Ballentine* (1955) 351 U.S. 570, 573 [100 L.Ed. 1415, 1424, 76 S.Ct. 974].) That the converse is also true is demonstrated in the number of appellate decisions phras-

ing the M'Naghten test with "and" rather than "or." Indeed, the Attorney General recognizes that the M'Naghten test has frequently been phrased carelessly with "and" rather than "or", and concludes that the use of the "and" in Penal Code section 25, subdivision (b) "is of no practical importance . . . ." Consequently, "the word 'and' may sometimes be interpreted as 'or' to carry out the intention of the Legislature in drafting a statute." (*Bianco* v. *Ind. Acc. Com.* (1944) 24 Cal.2d 584, 587 [150 P. 806]; see also *Santos* v. *Dondero* (1936) 11 Cal.App.2d 720, 723 [54 P.2d 764]; *People* v. *Wright* (1955) 131 Cal.App.2d Supp. 853, 862 [281 P.2d 384]; 58 Cal.Jur.3d, Statutes, § 136, p. 531.)

■ Where, as here, we are concerned with a measure adopted by the people through the initiative power, it is appropriate that the purpose of the measure be determined by reference to the language used, the ballot summary, the argument and analysis presented to the voters, and the contemporaneous construction by the Legislature. (See *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 203 [182 Cal.Rptr. 324, 643 P.2d 941]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

The purpose of Proposition 8 is stated in section 3 of the initiative measure. That section added section 28 to article I of the state Constitution. Subdivision (a) thereof provides, in relevant part: "The rights of victims pervade the criminal justice system, encompassing not only the right to restitution from the wrongdoers for financial losses suffered as a result of criminal acts, but also the more basic expectation that persons who commit felonious acts causing injury to innocent victims will be appropriately detained in custody, tried by the courts, and sufficiently punished so that the public safety is protected and encouraged as a goal of highest importance. [¶ omitted.] To accomplish these goals, broad reforms in the procedural treatment of accused persons and the disposition and sentencing of convicted persons are necessary and proper as deterrents to criminal behavior and to serious disruption of people's lives."

Proposition 8 was therefore intended to serve as a deterrent to criminal behavior. Deterrence was the precise reason our courts refused to adopt the irresistible impulse theory before *Drew*. As we have recounted, as long ago as 1882, the Supreme Court noted the three powerful deterrents to criminal behavior: the restraints of religion, conscience, and law. Of these only the restraint of law—the power to forbid and punish crime—is within the function of the government. To permit a disposition to commit crime to serve as an excuse for criminal behavior would be to remove this powerful deterrent and to withdraw from the state the power to deter crime. (See *People*

v. *Hoin, supra,* 62 Cal. at pp. 122-123.) The stated purpose of Proposition 8 supports the abrogation of the *Drew* decision and its volitional prong. But this purpose of deterrence would not be served by the abrogation of the M'Naghten test as well. This is because the restraint of law is dependent upon the ability of the individual to make a choice between right and wrong, and a person who cannot understand right and wrong cannot make such a choice. "[T]he M'Naghten test focuses on an accused's capacity to make a simple moral judgment; it is, therefore, geared to the traditional criminal law requirement of a mens rea." (2 Wharton's Criminal Law (14th ed. 1979) § 100, p. 10.) Thus, as the Supreme Court of Washington noted: "M'Naghten is preferable to the American Law Institute test in that the M'Naghten rule better serves the basic purpose of the criminal law—to minimize crime in society. . . . [W]hen M'Naghten is used, all who might possibly be deterred from the commission of criminal acts are included within the sanctions of the criminal law." (*State* v. *White* (1962) 60 Wn.2d 551 [374 P.2d 942, 966], cert. den. *sub nom. White* v. *Washington* (1963) 375 U.S. 883 [11 L.Ed.2d 113, 84 S.Ct. 154].)

The primary means by which Proposition 8 deters crime is through punishment. "In the perspective of penal law, however, punishment must be interpreted consistently with a view of human nature that takes account of problem-solving and available empirical knowledge as well as of valuation. The key to this interpretation is the meaning of responsibility, which includes normal competence, authorship of a proscribed harm and accountability. In sum, punishment is a corollary of responsibility, based upon the concept of man as capable, within limits, of making free choices and putting them into effect." (Hall, General Principles of Criminal Law (2d ed. 1960) p. 460.) The criminal law has long been based upon the concept of freedom of choice and adherence to the M'Naghten test has been based upon the refusal of the courts to accept the proposition that a person who knowingly commits a wrongful or criminal act should not be held accountable. (See *People* v. *Gilberg, supra,* 197 Cal. at pp. 313-314.) But the M'Naghten test recognizes that those who are incapable of understanding the wrongfulness of their conduct have no opportunity of choice and cannot harbor an evil intent or mens rea. "In sum, what the [right from wrong] clause requires is incapacity, due to serious mental disease, to make the relevant valuations of a normal adult—to realize, for instance, that it is wrong to kill a human being or take his property. . . . It expresses in plain words an abiding insight into what is paramount in human nature." (Hall, General Principles of Criminal Law, supra, pp. 481-482.)

It can thus be seen that the purposes of Proposition 8 would be served by the abrogation of *Drew,* but not by the abrogation of M'Naghten. As we have noted, the language of the initiative adopts and utilizes the language

of the California version of M'Naghten.[10] Nothing in the history of the enactment of the new statute, however, compels the conclusion that the people intended to reject the M'Naghten standard and yet simultaneously adopt its age-old phraseology. The ballot analysis by the legislative analyst reveals little about the intent of the people in enacting subdivision (b) of section 25. That analysis simply states: "This measure would provide that in order to be found not guilty by reason of insanity a defendant must prove that he or she (1) was incapable of knowing or understanding the nature and quality of his or her actions and (2) was incapable of distinguishing right from wrong at the time of the crime. These provisions could increase the difficulty of proving that a person is not guilty by reason of insanity." (Legislative Analyst's Analysis, Ballot Pamp., Proposed Amends. to Cal. Const., Primary Elect. (June 8, 1982) p. 55.) Nor do the ballot arguments aid our inquiry. The only reference to this provision in the arguments was by then Lieutenant Governor Mike Curb, who asserted: "By voting 'yes' on the Victims' Bill of Rights you will restore balance to the rules governing the use of evidence against criminals, you will limit the ability of violent criminals to hide behind the insanity defense, and you will give us a tool to stop extremely dangerous offenders from being released on bail to commit more violent crimes." (Ballot Pamp., Primary Elect., *supra,* at p. 34.)

While the ballot pamphlet makes clear that Proposition 8 was intended, in part, to provide a more stringent standard for insanity than the "broad test of nonresponsibility" adopted in *Drew,* it does not provide guidance in determining what the new test was to be. Perhaps in this respect the ballot pamphlet is more significant in what it does not contain than in what is in it. As our discussion has demonstrated, the M'Naghten test has generally focused upon the defendant's ability to understand what he was doing was wrong. This test is satisfied if the defendant either lacked the capacity to understand the nature and quality of his actions, in which case he could not be able to understand right and wrong in relation thereto, or was incapable of knowing that what he was doing was wrong. If Proposition 8 in fact requires the defendant to establish both of these M'Naghten prongs, then despite its similarity to the language of M'Naghten, it has abolished M'Naghten's right and wrong standard. In fact, it would adopt for California the most stringent and difficult test for criminal insanity employed by a common law jurisdiction since the days of the old English common law. (See *People* v. *Drew, supra,* 22 Cal.3d at pp. 342-346; *Leland* v. *Oregon, supra,* 343 U.S. 800-801 [96 L.Ed. at 1309-1310].) If such were the pur-

---

[10]In *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], the Supreme Court noted that this statutory definition of insanity "resembles the M'Naghten test rejected by this court in *People* v. *Drew." (Id.,* at p. 368, fn. 19.) In our view, more than merely resembling it, the definition in fact restates the M'Naghten standard, albeit in an imprecise way.

pose of Proposition 8 then it would be expected that the provision would have been much ballyhooed by its proponents and severely castigated by its opponents. To the contrary, the insanity provisions of Proposition 8 elicited relatively little public comment.

Proposition 8 was passed by the electorate on June 8, 1982, and became law the following day. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [186 Cal.Rptr. 77, 651 P.2d 321].) On that day the Attorney General issued his Attorney General's Guide to Proposition 8, Victims' Bill of Rights. The accompanying cover letter, addressed to district attorneys, sheriffs, and chief probation officers, recites: "I have assembled a team of people in the Department of Justice. That team has prepared the material in this guide to help you in its implementation and to aid in its defense against the inevitable attacks." With regard to Penal Code section 25, subdivision (b), the guide at pages 8-5 and 8-6, concludes: "Essentially, this restores the traditional M'Naghten rule as to insanity, *People* v. *Kelly* (1973) 10 Cal.3d 565, 574, which was overturned by the California Supreme Court in *People* v. *Drew* (1978) 22 Cal.3d 333. [¶] While 'and' is used between the two phrases, although 'or' was used in the former test, there appears to be little practical difference between the former version of M'Naughton and the new structure." We agree with this assessment that the new statute "restores the traditional M'Naghten rule."

■ Finally, in determining the intent of a statutory enactment it is important to consider the state of the law as it existed prior to the enactment of the provision at issue. (*Estate of Simoni* (1963) 220 Cal.App.2d 339, 341 [33 Cal.Rptr. 845].) The body of literature on the insanity defense is enormous, and usually centers around the appropriateness of the M'Naghten test. (See *People* v. *Drew, supra,* 22 Cal.3d at pp. 340-344.) Criticisms of the test address numerous issues, but generally assert that the test is too "strict" to serve its purpose. (*Ibid.,* see also Diamond, *From M'Naghten to Currens, and Beyond,* (1962) 50 Cal. L.Rev. 189.) But significantly absent from the literature is the suggestion that M'Naghten is too "lenient" as a test of insanity. Indeed, the California doctrine of diminished capacity was expressly fashioned to ameliorate the harshness of the M'Naghten rule. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 677].)[11] In California, until the decision in *Drew,* the M'Naghten standard, despite its liberalization, was rigidly adhered to by the courts as the exclusive test for insanity. The Legislature similarly declined to abandon M'Naghten, and on the occasions legislation was introduced to do so it

---

[11]Proposition 8 also abrogated the defense of diminished capacity. Penal Code section 25, subdivision (a) provides in relevant part that "[t]he defense of diminished capacity is hereby abolished."

failed to pass. In short, the M'Naghten standard was frequently criticized, but never on the ground that it favored the accused. In *Drew* the Supreme Court judicially abandoned M'Naghten, but as the commentator noted in *People* v. *Drew—Will California's New Insanity Test Ensure a More Accurate Determination of Insanity* (1980) 17 San Diego L.Rev. 491 at page 509: "The *Drew* court failed to consider what the community reaction might be to an expansion of the insanity defense." The community reaction was one of disapproval and we find the result in Proposition 8. There is no indication in that disapproval, however, that the People intended to do anything except abrogate the decision in *Drew*.

For all of these reasons, we decline to interpret the statute as enacting a new drooling idiot test in place of the century old M'Naghten standard merely because it uses the single, and often misused, conjunctive "and." That conjunctive is too thin a reed to support such a massive doctrinal transformation.

In this case in addition to the briefs from defendant and the People we have accepted amicus curiae briefs from the State Public Defender and the California Attorneys for Criminal Justice in support of defendant, and from the Criminal Justice Legal Foundation in support of the People. It is significant that all of the parties who have submitted briefs are in agreement that the insanity provisions of Proposition 8 were intended to abrogate *Drew* and return to the traditional M'Naghten standard. While we are reluctant to decide a matter of statewide significance based upon a concession of the parties, in this case our independent research convinces us that this position is sound. ▮▮▮ Accordingly, we hold that Penal Code section 25, subdivision (b), reinstates the California M'Naghten right and wrong test as the standard for the insanity defense in this state.[12]

Since we conclude that Proposition 8 and Penal Code section 25, subdivision (b), abrogate the *Drew* decision and return California to the right and wrong standard of criminal insanity, it is unnecessary for us to consider the contentions that a stricter standard would violate the constitutional requirement of due process and the prohibition against cruel and unusual punishment. The right and wrong test passes constitutional muster. (*Leland* v.

---

[12]The M'Naghten formulation was consistently held to require that the inability to distinguish between right and wrong be the result of a mental disease or defect or a "settled" insanity. (See *People* v. *Kelly, supra,* 10 Cal.3d at pp. 574-576.) As the trial court noted, Penal Code section 25, subdivision (b), does not expressly state that the insanity defense requires a settled mental disease or defect. Indeed, the section does not even expressly require that defendant's incapacity arise by reason of mental disease or mental defect. (But see Comment to CALJIC 4.00 [1982 Rev.] (4th ed. 1982 pocket pt.) p. 30.) It is unnecessary in this case to consider whether the defense may be established without a settled disease or defect, since it is clear that defendant in fact suffers from a long-standing mental illness.

*Oregon, supra,* 343 U.S. at pp. 800-801 [96 L.Ed. at p. 1310].) **(5)** We also reject the contention that section 25, subdivision (b) is unconstitutionally vague. The M'Naghten right and wrong test is well defined. (See *People* v. *Kelly, supra,* 10 Cal.3d 3 at pp. 574-576; *People* v. *Wolff, supra,* 61 Cal.2d at pp. 800-801.) We turn then to a consideration whether defendant is entitled to a finding of not guilty by reason of insanity.

**(6a)** Defendant contends the People are collaterally estopped to deny that she was insane. This is based on the fact, pointed out to the trial court, that in a Placer County proceeding on an arson charge which occurred shortly before the present incident, defendant was found to have been legally insane. We reject the contention that collateral estoppel is applicable here. ▮ "Collateral estoppel precludes a party to an action from relitigating in a second proceeding matters litigated and determined in a prior proceeding." (*People* v. *Sims* (1982) 32 Cal.3d 468, 477 [186 Cal.Rptr. 77, 651 P.2d 321], citations and fn. omitted.) Consequently, "an adjudication of an issue in a criminal trial may collaterally estop the state from pursuing another criminal prosecution based on the same controversy." (32 Cal.3d at p. 482.) ▮ But that doctrine applies only where the issue sought to be relitigated is identical to an issue already necessarily decided in prior litigation. (*People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622]; *Jackson* v. *City of Sacramento* (1981) 117 Cal.App.3d 596, 602 [172 Cal.Rptr. 826].) The issue in an insanity trial is whether the defendant, at the time of the commission of the offense, could appreciate right and wrong in relation to the very act with which she is charged. (*People* v. *Wolff, supra,* 61 Cal.2d at pp. 800-801.) Whether defendant could appreciate the wrongfulness of her conduct in relationship to an arson some days before this incident is not determinative of her sanity in this case and hence poses a different issue in a different controversy. As the psychiatric testimony in this case established, defendant's illness subjects her to mood swings and her mental capacity at one point in time is not necessarily indicative of her capacity at another time. In short, the sanity issue decided in the Placer County prosecution is not identical to the issue posed in this case because proof of insanity on one day is not proof of insanity on another. (*People* v. *Glover* (1967) 257 Cal.App.2d 502, 509 [65 Cal.Rptr. 219].)

▮ The People, while agreeing that section 25, subdivision (b) reinstates the M'Naghten standard, urge that the two prongs of the M'Naghten test are really the same thing. As our earlier discussion forecasts, we must reject this contention. A person who is capable of understanding the nature and quality of her action is not necessarily capable of appreciating the wrongfulness of her conduct. The evidence in this case illustrates this truism. There was no real evidence that defendant could not understand the nature and quality of her act. From her testimony it is clear that she was aware

that she was driving her car, was being followed by the gas station attendant on his motorcycle, and that she was entering an intersection on a red light. However, the psychiatric testimony and defendant's own recollection supported the claim that she was incapable of appreciating the wrongfulness of her conduct.

▮▮ The trial court rejected the insanity defense, but in doing so it expressly found that defendant met the second prong of the M'Naghten test because she was incapable of distinguishing between right and wrong at the time of the incident. Since this finding established insanity under the M'Naghten test, defendant is entitled to a judgment of not guilty by reason of insanity. (See *People* v. *Kelly, supra,* 10 Cal.3d at p. 577.)

The judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment of not guilty by reason of insanity and to take such further proceedings as are required by law.

Sims, J., concurred.

**EVANS, Acting P. J.**—I respectfully dissent.

Although the conclusion reached by the majority that the voters, by enacting Proposition 8 which added Penal Code section 25, subdivision (b), merely reestablished the *"M'Naghten"* standard for establishing criminal insanity as a defense is judicially and humanistically appealing, I cannot join in that conclusion.

The *M'Naghten* standard, traditionally referred to as the "right and wrong" test, was judicially stated to be "[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or,* if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].) (Italics added.) I emphasize the use of the disjunctive to demonstrate what I perceive as the flaw in the judicial reasoning utilized by the majority in reaching their conclusion that the voters intended to merely reestablish the original *M'Naghten* standard for proving criminal insanity.

The text of Penal Code section 25, subdivision (b), demonstrates that the initiative enacted by the People imposes a far more stringent standard which requires proof that the accused suffered from both aspects of the *M'Naghten* test.

Viewed from any intellectual position, the harshness of the result extracted by the clear, unambiguous language of the provisions of section 25, subdivision (b), is apparent. However, that harshness does not rise to prohibitive constitutional dimension or compel a statutory change by judicial decision; the fact that the statute compels a harsh result does not render it ambiguous and subject to interpretation. Merely because the language used results in the imposition of a strict standard for the defense of criminal insanity, we may not be permitted to indulge a judicial preference and conjure a judicial amendment to the statute by construing "and" to mean "or."

The terms "and" and "or," clearly conjunctive and disjunctive, may have at times in the past been erroneously used interchangeably by careless courts; however, that circumstance does not permit us to be so presumptive as to conclude the people, by their initiative process, didn't mean what they clearly stated, that the conjunctive rather than the disjunctive be required and both prongs of the *M'Naghten* test be established in order to prove insanity as a criminal defense.

Even though the conclusion I reach may be simplistic when measured in the light of the dissertation presented by the majority on the historical development and effects of the various definitions of insanity used by the courts, I am forced to that conclusion by the compulsion of mandated judicial restraint when attempting to ascertain the intent of the voters in enacting, by the initiative method, this statute.

The proper point of beginning for a review of such a statute is by an attempt to ascertain the intent of the voters. In this instance, prior to the initiative election, Proposition 8 received widespread publicity. Newspaper, radio, and television editorials focused on its provisions and extensive public debate involving the proposition described the pros and the cons of the measure. Moreover, before the election, each voter received an election pamphlet containing the title and summary prepared by the Attorney General, a detailed analysis of the measure prepared by the legislative analyst, and a complete text of the proposed law. That text contains the entirety of the 10 sections of the Victims' Bill of Rights and included in strikeout type the text of former article I, section 12, of the California Constitution. Each voter was additionally provided written arguments in favor of Proposition 8 and rebuttal thereto, and written arguments against Proposition 8 and rebuttal thereto. In those documents the analysis by the legislative analyst described the test of insanity in the conjunctive and stated, "These provisions could increase the difficulty of proving that a person is not guilty by reason of insanity." In the argument submitted to the voters in favor of Proposition 8 was the statement, "[Y]ou will limit the ability of violent criminals to hide behind the insanity defense, . . . [¶] . . . Of those *con-*

*victed* of felonies, one-third go to state prison and the remaining two-thirds are back in the community in a relatively short period of time. [¶] THERE IS ABSOLUTELY NO QUESTION THAT THE PASSAGE OF THIS PROPOSITION WILL RESULT IN . . . MORE CRIMINALS BEING SENTENCED TO STATE PRISON, AND MORE PROTECTION FOR THE LAW-ABIDING CITIZENRY. . . .''

The defendant implicates the argument that the voters were misled or confused in requiring the more difficult standard of proving both prongs of the *M'Naghten* test. Such an argument can only be based upon the improbable assumption that the people did not know what they were doing. In our judicial review, we should not lightly presume that the voters were unaware of the consequences of their actions in approving Proposition 8. Rather, in accord with the Supreme Court's mandated procedures, "we ordinarily should assume that the voters who approved a constitutional amendment '. . . have voted intelligently upon an amendment to their organic law, the whole text of which was supplied to each of them prior to the election and which they must be assumed to have duly considered . . . .' [Citation.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 243-244 [149 Cal.Rptr. 239, 583 P.2d 1281].)

All insanity tests recognize distinctions among the mentally ill and exculpate only those whose illness results in an incapacity to meet the then minimum criterion for responsibility. Under any analysis, "sound mind" and "legal sanity" are not synonymous. The purpose of rules regarding insanity as a defense have traditionally been to separate the sane from the insane so far as criminal culpability is concerned. The mere fact that Penal Code section 25, subdivision (b), requires a most extreme and stringent test in order to establish the defense of criminal insanity does not render it unconstitutional or invalid; nor may we say the voters did not mean what they said.

The section under challenge provides in pertinent part, "In any criminal proceeding, . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (Italics added.) I would conclude the trial court properly ruled the statute required defendant to prove both prongs of the insanity test by a preponderance of the evidence.

I can find nothing in the statute, the entire initiative, the arguments presented in favor of, in rebuttal to, or in explanation of the text of the initiative, that would imply that the voters did not intend the conjunctive to be

the requirement rather than by implication the disjunctive. Under the statute, criminally insane persons, that is those who know neither the nature of their act nor its wrongfulness, would presumably be unable to benefit from the punishment imposed by way of a criminal sentence or to be rehabilitated or deterred thereby. Conversely, persons who know the nature and consequences of their act, *or* know the act they are committing is wrong, could presumably benefit from or be deterred by the imposition of criminal punishment. As a result, the criminally insane as established under section 25, subdivision (b), are different than the noncriminally insane with respect to the legitimate purpose of the law.

Since the defendant failed to establish by a preponderance of the evidence that she met both standards enunciated in the statute, I would affirm the judgment.

A petition for a rehearing was denied August 27, 1984, and respondent's petition for a hearing by the Supreme Court was denied October 4, 1984. Lucas, J., was of the opinion that the petition should be granted.